**LAW OFFICE OF CARL M. VARADY**
Carl M. Varady (HI Bar No. 4873)
Pauahi Tower
1003 Bishop Street, Suite 1730
Honolulu, Hawaiʻi 96813
Telephone: 808-523-8447
E-mail: carl@varadylaw.com

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| GEORGE ASSAD, Derivatively on Behalf of HAWAIIAN ELECTRIC INDUSTRIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SCOTT W. H. SEU, THOMAS B. FARGO, PEGGY Y. FOWLER, CELESTE A. CONNORS, WILLIAM JAMES SCILACCI, JR., MICAH A. KANE, ELISIA K. FLORES,  SHELEE M. T. KIMURA, TIMOTHY E. JOHNS, JAMES A. AJELLO, MARY E. KIPP, ALANA KOBAYASHI PAKKALA. TOBY B. TANIGUCHI, PAUL K. ITO, JEFFREY N. WATANABE, RICHARD J. DAHL, YOKO OTANI, MICHAEL J. KENNEDY, KEITH P. RUSSELL, MARY G. POWELL, EVA T. ZLOTNICKA, KELVIN H. TAKETA, KEVIN M. BURKE, CONSTANCE H. LAU, GREGORY C. HAZELTON, and TAYNE S. Y. SEKIMURA, <br><br> Defendants, <br><br> -and- <br><br> HAWAIIAN ELECTRIC INDUSTRIES, INC., a Hawaiʻi Corporation, <br><br> Nominal Defendant. | Case No. <br><br><br><br><br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT; DEMAND FOR JURY TRIAL; EXHIBITS 1-3; VERIFICATION |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Plaintiff George Assad ("Plaintiff"), by his attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## I.     NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendant Hawaiian Electric Industries, Inc. ("Hawaiian Electric," "HEI," or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in significant damages to Hawaiian Electric's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Hawaiian Electric is the largest supplier of electricity in Hawaiʻi, supplying power to 95% of Hawaiʻi's population through its electric utilities: Hawaiian Electric Company, Inc. ("HECO" or "Hawaiian Electric Company"),

Hawaii Electric Light Company, Inc. ("HELCO"), and Maui Electric Company, Limited ("MECO").

3.      The Individual Defendants (defined below) knew for years that the areas Hawaiian Electric serviced were at risk of severe weather events, that Hawaiian Electric's equipment was not adequately maintained, and that the Company's safety protocols and procedures were inadequate.  Despite this knowledge of material risks to the Company, its customers, and the Hawaiian environment, the Individual Defendants failed to implement policies and practices meant to meaningfully mitigate these material risks.  For example, Hawaiian Electric knew of the August 24, 2018, fire in the Kauaʻula Valley, a West Maui community uphill from Lahaina where a community of Native Hawaiians live on ancestral *kuleana* land that has been in their families for centuries.  The 2018 "wall of fire" burned 21 houses, 27 cars, and more than 2,100 acres, causing $4.3 million in damage and displacing dozens of people.  Notwithstanding the horrific damage and terrifying risks exposed by the 2018 fire, Hawaiian Electric failed to take such basic steps as replacing old wooden power poles surrounded by vegetation and implement appropriate safety procedures in case of a wildfire, such as de-energizing power lines.  The Individual Defendants also made materially false and misleading statements concerning the Company's assessment of these known material risks and the mitigations in place in case of severe weather events.

4.      Starting on August 4, 2023, the National Weather Service ("NWS") in Honolulu warned that Hawaiʻi could experience "[s]trong and gusty trade winds" and "[d]ry weather [and] high fire danger" conditions from August 7, 2023 through August 9, 2023.  On August 6, 2023, Hawaiʻi News Now raised a Red Flag Alert through August 8, 2023, reporting that "strong winds with gusts to 60 mph are buffeting the state as Hurricane Dora passes south of the island chain, *fueling brush fires* and downing trees."  Then, on August 8, 2023, a devastating series of wildfires broke out in Maui, destroying Lahaina and burning Upcountry areas of Olinda and Kula.  The Individual Defendants' poor planning and failure to take action to avoid and mitigate known risks left the Company ill-equipped to handle this foreseeable disaster.  Power lines were kept energized during the severe weather which led to the power poles becoming overloaded.  The combination of high voltage power lines that were not de-energized properly, carried by old wooden poles, high winds, and overloaded poles led to the poles snapping and falling into overgrown vegetation, becoming kindling for fires.

5.      Fires swept through areas of Maui, including Lahaina, causing the massive destruction of thousands of homes and businesses, displacement of thousands of people, and damage to many treasured irreplaceable historic and cultural sites.  More than one hundred people died, and many people suffered from severe burns.   Initial  numbers  from  the  Pacific  Disaster  Center  and  Federal

Emergency Management Agency ("FEMA") estimate the cost of rebuilding after damage from the wildfires at $5.52 billion.  In the wake of the August fires, the non-congregate shelter program managed by the American Red Cross was housing more than 8,000 individuals at one point.  The December 2023 figures from FEMA, which provides the bulk of funding for the program, showed 6,297 displaced residents comprising 2,623 households then forced to live spread across 33 hotels and condos.

6.     On August 12, 2023, news outlets began reporting that Hawaiian Electric lacked the proper policies and procedures to mitigate the impact of the wildfires.  Specifically, they revealed that, at the time the wildfires began, the Company did not maintain a public power shutoff plan—a plan in which electricity is intentionally cut off to areas where strong wind events could cause fires to spread.

7.     In the wake of the August 12, 2023 news, Hawaiian Electric's stock fell more than 55% over the next several days, closing on August 16, 2023 at just $14.57 per share compared to the August 11, 2023's closing of $32.40 per share.  This drop erased nearly $2 billion in Hawaiian Electric's market capitalization.

8.     Then, on August 16, 2023, the *Wall Street Journal* ("*WSJ*") reported that Hawaiian Electric was meeting with firms that specialize in restructuring advisory work, exploring options for the various financial and legal challenges that the Company faces as a consequence from the wildfires.  On August 17, 2023, the *WSJ* reported that Hawaiian Electric had been aware of the threat posed by wildfires

for years but waited years to act.  Indeed, the *WSJ* reported that between 2019 and 2022 the Company spent less than $245,000 on wildfire-specific projects on Maui and did not seek state approval to raise utility rates to pay for broad wildfire safety improvements until 2022.

9.     That same day, on August 17, 2023, Hawaiian Electric's stock plunged more than 17.4%, or $2.54 per share, to close at $12.03 per share compared to the previous trading day's closing of $14.57 per share, erasing another $278 million in market capitalization.

10.    The revelations about the Company's lack of fire prevention and mitigation policies demonstrated that the Individual Defendants' prior statements concerning the Company's: (i) risk mitigations; (ii) adherence to environmental, social, and governance ("ESG") principles; (iii) safety protocols and procedures; and (iv) maintenance of its equipment were all false.

11.    Hawaiian Electric's wrongdoing did not end with the devastating fires. News reports state that the Company moved evidence concerning the fires before the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") could investigate their cause.  The Company's actions likely violated national guidelines collecting and preserving evidence after a wildfire and deprived the ATF of investigating an original scene.  Hawaiian Electric was also aware of California

utility companies that moved evidence after a fire and later faced massive fines.  The Company now faces potential fines for spoliation of evidence.

12.    As a result of the Individual Defendants' wrongdoing, the Company is subject to numerous actions (identified in further detail below) alleging claims of wrongful death, negligence, gross negligence, strict liability, premises liability, trespass, private nuisance, public nuisance, intentional infliction of emotional distress, inverse condemnation, and ultrahazardous activity.  Hawaiian Electric is also the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Hawaiian Electric's shares at inflated prices.[1]

## II.    JURISDICTION AND VENUE

13.    Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts

---

[1] *Bhangal v. Hawaiian Electric Industries, Inc., et al.*, Case No. 3:23-cv-04332 (N.D. Cal.) (the "Securities Class Action").

with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Hawaiian Electric maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Hawaiian Electric, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiff

16.    Plaintiff was a shareholder of Hawaiian Electric at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Hawaiian Electric shareholder.  Plaintiff is a citizen of Massachusetts.

### B.    Nominal Defendant

17.    Nominal defendant Hawaiian Electric is a Hawaiʻi corporation with principal executive offices located at 1001 Bishop Street, Suite 2900, Honolulu, Hawaiʻi.  Accordingly, Hawaiian Electric is a citizen of Hawaiʻi.  Hawaiian Electric is a holding company with subsidiaries principally engaged in electric utility,

banking, and non-regulated renewable/sustainable infrastructure businesses operating in the State of Hawaiʻi. Hawaiian Electric is the parent company of HECO, which is in turn the parent company of Hawaii Electric Light Company, Inc. and MECO. HECO and its operating utility subsidiaries, Hawaii Electric Light Company, Inc. and MECO are regulated electric public utilities that serve communities on the islands of Oʻahu, Hawaiʻi, Maui, Lānaʻi, and Molokaʻi. Hawaiian Electric had seventy-five employees as of December 31, 2023, and HECO and its subsidiaries had 2,654 employees as of the same date.

### C.   Defendants

18.   Defendant Scott W. H. Seu ("Seu") has been Hawaiian Electric's President, Chief Executive Officer ("CEO"), and a director since January 2022. Defendant Seu was also Hawaiian Electric Company's President and CEO from February 2020 to December 2021; Senior Vice President, Public Affairs from January 2017 to February 2020; Vice President, System Operation from May 2014 to December 2016; Vice President, Energy Resources and Operations from January 2013 to April 2014; Vice President, Energy Resources from August 2010 to December 2012; Manager, Resource Acquisition Department from March 2009 to August 2010; Manager, Energy Projects Department from May 2004 to March 2009; Manager, Customer Installations Department from January 2003 to May 2004; Manager, Environmental Department from April 1998 to December 2002; Principal

Environmental Scientist from January 1997 to April 1998; Senior Environmental Scientist from May 1996 to December 1996; and Environmental Scientist from August 1993 to May 1996. Defendant Seu was also a Hawaiian Electric Company director from at least May 2020 to January 2022. Defendant Seu is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The Company paid defendant Seu the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | Total Without Change in Pension Value | Total |
|------|--------|--------------|----------------------------------------|-------------------------|----------------------------------------|-------|
| 2022 | $875,000 | $1,830,874 | $869,129 | $236,512 | $3,575,003 | $3,811,515 |
| 2021 | $506,667 | $821,405 | $599,588 | $1,002,005 | $1,927,660 | $2,929,665 |
| 2020 | $419,750 | $651,282 | $394,587 | $999,547 | $1,465,619 | $2,465,166 |

Defendant Seu is a citizen of Hawaiʻi.

19.    Defendant Thomas B. Fargo ("Fargo") has been Hawaiian Electric's Chairman of the Board of Directors (the "Board") since May 2020, and a director since January 2005. Defendant Fargo was also a Hawaiian Electric Company director from January 2005 to at least March 2016. The Company paid defendant Fargo the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2022 | $230,000 | $120,000 | $350,000 |
| 2021 | $227,500 | $100,000 | $327,500 |
| 2020 | $185,008 | $100,000 | $285,008 |
| 2019 | $111,000 | $100,000 | $211,000 |

Defendant Fargo is a citizen of Hawaiʻi.

20.    Defendant Peggy Y. Fowler ("Fowler") has been a Hawaiian Electric director since May 2011.  Defendant Fowler was also a Hawaiian Electric Company director from 2009 to at least March 2016.  The Company paid defendant Fowler the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $120,000 | $120,000 | $240,000 |
| 2021 | $112,500 | $100,000 | $212,500 |
| 2020 | $109,500 | $100,000 | $209,500 |
| 2019 | $109,726 | $100,000 | $209,726 |

Defendant Fowler is a citizen of Oregon.

21.    Defendant Celeste A. Connors ("Connors") has been a Hawaiian Electric director since May 2019.  Defendant Connors has been a member of Hawaiian Electric's Audit & Risk Committee since at least February 2024, and was also a member of that committee from at least March 2020 to at least March 2022.  The Company paid defendant Connors the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $95,000 | $120,000 | $215,000 |
| 2021 | $89,500 | $100,000 | $189,500 |
| 2020 | $86,500 | $100,000 | $186,500 |
| 2019 | $48,832 | $100,000 | $148,832 |

Defendant Connors is a citizen of Hawaiʻi.

22.    Defendant William James Scilacci, Jr. ("Scilacci") has been a Hawaiian Electric director since May 2019.  Defendant Scilacci has been the Chair and a member of Hawaiian Electric's Audit & Risk Committee since at least March 2020.  The Company paid defendant Scilacci the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $111,500 | $120,000 | $231,500 |
| 2021 | $98,000 | $100,000 | $198,000 |
| 2020 | $96,500 | $100,000 | $196,500 |
| 2019 | $57,870 | $100,000 | $157,870 |

Defendant Fargo is a citizen of California.

23.    Defendant Micah A. Kāne ("Kāne") has been a Hawaiian Electric director since August 2019.  Defendant Kāne was also a Hawaiian Electric Company director from at least May 2012 to at least May 2019.  Defendant Kāne was also a member of Hawaiian Electric Company's Audit & Risk Committee in March 2019. The Company paid defendant Kāne the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $102,363 | $120,000 | $222,363 |
| 2021 | $91,000 | $100,000 | $191,000 |
| 2020 | $89,500 | $100,000 | $189,500 |
| 2019 | $39,722 | $76,561 | $116,283 |

Defendant Kāne is a citizen of Hawai'i.

24.    Defendant Elisia K. Flores ("Flores") has been a Hawaiian Electric director since December 2021.  Defendant Flores has been a member of Hawaiian Electric's Audit & Risk Committee since at least March 2023.  The Company paid defendant Flores the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $112,113 | $120,000 | $232,113 |
| 2021 | $62,527 | $42,740 | $105,267 |

Defendant Flores is a citizen of Hawai'i.

25.    Defendant Shelee M. T. Kimura ("Kimura") has been Hawaiian Electric Company's President, CEO, and a director since January 2022. Defendant Kimura was also Hawaiian Electric Company's Senior Vice President, Customer Service and Public Affairs from March 2021 to December 2021; Senior Vice President, Customer Service from February 2019 to March 2021; Senior Vice President, Business Development and Strategic Planning from January 2017 to February 2019; and Vice President, Corporate Planning and Business Development from May 2014 to January 2017. Defendant Kimura was also Hawaiian Electric's Director, Investor Relations, Strategic Planning & Budget from November 2009 to May 2014, and also Manager, Corporate Finance and Investments from August 2004 to November 2009. The Company paid defendant Kimura the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | Total Without Change in Pension Value | Total |
|------|--------|-------------|---------------------------------------|-----------------------------------------------------------------------|---------------------------------------|-------|
| 2022 | $450,000 | $814,267 | $249,909 | - | $1,514,176 | $1,514,176 |
| 2021 | $292,000 | $287,818 | $215,919 | $148,665 | $795,737 | $944,402 |

Defendant Kimura is a citizen of Hawaiʻi.

26.    Defendant Timothy E. Johns ("Johns") has been Hawaiian Electric Company's Chairman of the Board since January 2020 and a director since 2005. Defendant Johns has been the Chairman of Hawaiian Electric Company's Audit &

Risk Committee since 2010.  Hawaiian Electric Company paid defendant Johns the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $135,750 | $66,000 | $201,750 |
| 2021 | $129,000 | $55,000 | $184,000 |
| 2020 | $120,603 | $55,000 | $175,603 |
| 2019 | $61,671 | $55,000 | $116,671 |

Defendant Johns is a citizen of Hawaiʻi.

27.    Defendant James A. Ajello ("Ajello") has been a Hawaiian Electric Company director since at least May 2020.  Defendant Ajello was also Hawaiian Electric's Executive Vice President and Chief Financial Officer ("CFO") from June 2011 to April 2017; Treasurer from January 2009 to July 2013; and Senior Vice President from January 2009 to June 2022.  Defendant Ajello has been a member of Hawaiian Electric Company's Audit & Risk Committee since May 2020.  Hawaiian Electric Company paid defendant Ajello the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $58,500 | $66,000 | $124,500 |
| 2021 | $53,500 | $55,000 | $108,500 |
| 2020 | $34,471 | $55,000 | $89,471 |

Defendant Ajello is a citizen of Texas.

28.    Defendant Mary E. Kipp ("Kipp") has been a Hawaiian Electric Company director since January 2023.  Defendant Kipp has been a member of Hawaiian Electric Company's Audit & Risk Committee since January 2023. Defendant Kipp is a citizen of Washington.

29.     Defendant Alana Kobayashi Pakkala ("Pakkala") has been a Hawaiian Electric Company director since 2020.  Defendant Pakkala has been a member of Hawaiian Electric Company's Audit & Risk Committee since April 2022.  Hawaiian Electric Company paid defendant Pakkala the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $56,378 | $66,000 | $122,378 |
| 2021 | $46,000 | $55,000 | $101,000 |
| 2020 | $26,085 | $55,000 | $81,085 |

Defendant Pakkala is a citizen of Hawai'i.

30.     Defendant Toby B. Taniguchi ("Taniguchi") has been a Hawaiian Electric Company director since at least May 2021.  Defendant Taniguchi has been a member of Hawaiian Electric Company's Audit & Risk Committee since April 2022.   Hawaiian Electric Company paid defendant Taniguchi the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $56,378 | $66,000 | $122,378 |
| 2021 | $29,299 | $55,000 | $84,299 |

Defendant Taniguchi is a citizen of Hawai'i.

31.     Defendant Paul K. Ito ("Ito") has been Hawaiian Electric Company's Senior Vice President, CFO, and Treasurer since October 2023.  Defendant Ito was also Hawaiian Electric's Executive Vice President, and CFO from January 2023 to October 2023; Treasurer from November 2019 to October 2023; Interim CFO from July 2022 to December 2022; and Vice President – Tax and Controller from

February 2018 to December 2022.   Defendant Ito is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.   The Company paid defendant Ito the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total Without Change in Pension Value | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|---------------------------------------|-------|
| 2022 | $313,425 | $108,750 | $244,373 | $140,054 | $9,150 | $815,752 | $815,752 |

Defendant Ito is a citizen of Hawai'i.

32.     Defendant Jeffrey N. Watanabe ("Watanabe") was Hawaiian Electric's Chairman of the Board from May 2006 to May 2020, and a director from 1987 to May 2020.   Defendant Watanabe was also a Hawaiian Electric Company director from 2008 to 2011, and also from 1999 to 2006.   The Company paid defendant Watanabe the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2020 | $112,500 | - | $112,500 |
| 2019 | $331,978 | $100,000 | $431,978 |

Defendant Watanabe is a citizen of Hawai'i.

33.     Defendant Richard J. Dahl ("Dahl") was a Hawaiian Electric director from January 2017 to August 2023.   Defendant Dahl was also a Hawaiian Electric Company director from January 2017 to at least March 2019.   Defendant Dahl was a member of Hawaiian Electric's Audit & Risk Committee from at least March 2019

to at least March 2023, and also a member of Hawaiian Electric Company's Audit & Risk Committee in at least March 2019.  The Company paid defendant Dahl the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $121,500 | $120,000 | $241,500 |
| 2021 | $111,000 | $100,000 | $211,000 |
| 2020 | $103,066 | $100,000 | $203,066 |
| 2019 | $94,128 | $100,000 | $194,128 |

Defendant Dahl is a citizen of Hawai'i.

34.    Defendant Yoko Otani ("Otani") was a Hawaiian Electric director from January 2023 to August 2023.  Defendant Otani was a member of Hawaiian Electric's Audit & Risk Committee from January 2023 to at least March 2023. Defendant Otani is a citizen of New York.

35.    Defendant Michael J. Kennedy ("Kennedy") was a Hawaiian Electric director from August 2022 to August 2023.  The Company paid defendant Kennedy the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $85,636 | $91,068 | $176,704 |

Defendant Kennedy is a citizen of California.

36.    Defendant Keith P. Russell ("Russell") was a Hawaiian Electric director from May 2011 to May 2023.  Defendant Russell was also a Hawaiian Electric Company director from 2010 to at least March 2022.  Defendant Russell was a member of Hawaiian Electric's Audit & Risk Committee from at least March

2019 to at least March 2023.  The Company paid defendant Russell the following

compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $132,000 | $120,000 | $252,000 |
| 2021 | $120,000 | $100,000 | $220,000 |
| 2020 | $118,000 | $100,000 | $218,000 |
| 2019 | $112,500 | $100,000 | $212,500 |

Defendant Russell is a citizen of California.

37.    Defendant Mary G. Powell ("Powell") was a Hawaiian Electric director

from May 2019 to August 2021.  The Company paid defendant Powell the following

compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $50,815 | $100,000 | $150,815 |
| 2020 | $86,500 | $100,000 | $186,500 |
| 2019 | $48,832 | $100,000 | $148,832 |

Defendant Powell is a citizen of California.

38.    Defendant Eva T. Zlotnicka ("Zlotnicka") was a Hawaiian Electric

director from February 2020 to May 2021.  The Company paid defendant Zlotnicka

the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2021 | $32,225 | - | $32,225 |
| 2020 | $75,192 | $122,740 | $197,932 |

Defendant Zlotnicka is a citizen of Arizona.

39.    Defendant Kelvin H. Taketa ("Taketa") was a Hawaiian Electric director from 1993 to May 2019.  Defendant Taketa was also a Hawaiian Electric Company director from 2004 to at least May 2023.  Hawaiian Electric Company paid defendant Taketa the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $51,000 | $66,000 | $117,000 |
| 2021 | $45,000 | $55,000 | $100,000 |
| 2020 | $45,000 | $55,000 | $100,000 |
| 2019 | $29,299 | $55,000 | $84,299 |

Defendant Taketa is a citizen of Hawai'i.

40.    Defendant Kevin M. Burke ("Burke") was a Hawaiian Electric Company director from at least May 2018 to at least February 2023.  Defendant Burke was a member of Hawaiian Electric Company's Audit & Risk Committee from May 2019 to at least March 2023.  Hawaiian Electric Company paid defendant Burke the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $59,500 | $66,000 | $125,500 |
| 2021 | $53,500 | $55,000 | $108,500 |
| 2020 | $53,500 | $55,000 | $108,500 |
| 2019 | $49,883 | $55,000 | $104,883 |

Defendant Burke is a citizen of California.

41.    Defendant Constance H. Lau ("Lau") was Hawaiian Electric's President and CEO, and a director from May 2006 to January 2022, and also a director from June 2001 to December 2004; Treasurer from April 1989 to October 1999; and assistant Treasurer from December 1987 to April 1989.  Defendant Lau

- 19 -

was also Hawaiian Electric Company's Chairman of the Board and a director from May 2006 to May 2019; Treasurer from December 1987 to April 1989; and Assistant Corporate Counsel from September 1984 to December 1987.  Defendant Lau is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  The Company paid defendant Lau the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total Without Change in Pension Value | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|---------------------------------------|-------|
| 2021 | $955,000 | $3,204,098 | $1,756,546 | - | $17,879 | $5,933,523 | $5,933,523 |
| 2020 | $950,217 | $2,378,882 | $1,202,503 | $576,610 | - | $4,531,602 | $5,108,212 |
| 2019 | $926,300 | $2,344,943 | $957,886 | $660,533 | $13,239 | $4,242,368 | $4,902,901 |

Defendant Lau is a citizen of Hawai'i.

42.     Defendant Gregory C. Hazelton ("Hazelton") was Hawaiian Electric's Executive Vice President and CFO from March 2018 to July 2022; Treasurer from March 2018 to November 2019; Senior Vice President, Finance from October 2016 to April 2017; and Vice President, Finance, Treasurer and Controller from August 2013 to June 2015.  Defendant Hazelton is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  The Company paid defendant Hazelton the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total Without Change in Pension Value | Total |
|------|--------|-------------|----------------------------------------|------------------------|------------------------|--------------------------------------|-------|
| 2022 | $278,733 | $757,904 | $193,721 | - | $15,126 | $1,245,484 | $1,245,484 |
| 2021 | $546,400 | $1,100,746 | $653,243 | $116,175 | $26,054 | $2,326,443 | $2,442,618 |
| 2020 | $543,750 | $707,755 | $412,830 | $186,825 | $26,328 | $1,690,663 | $1,877,488 |
| 2019 | $527,917 | $693,866 | $321,724 | $184,099 | $26,057 | $1,569,564 | $1,753,663 |

Defendant Hazelton is a citizen of Texas.

43.    Defendant Tayne S. Y. Sekimura ("Sekimura") was Hawaiian Electric Company's Senior Vice President and CFO from at least October 2009 to September 2023; Treasurer from at least November 2021 to September 2023; Senior Vice President, Finance and Administration from at least February 2008 to at least August 2009; and Financial Vice President from at least October 2004 to at least February 2008. Hawaiian Electric Company paid defendant Sekimura the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | Total Without Change in Pension Value | Total |
|------|--------|-------------|----------------------------------------|------------------------------------------------------------------------|--------------------------------------|-------|
| 2022 | $397,500 | $351,002 | $161,923 | - | $910,425 | $910,425 |
| 2021 | $385,000 | $403,546 | $313,333 | $317,962 | $1,101,879 | $1,419,841 |
| 2020 | $383,133 | $326,050 | $240,031 | $857,936 | $949,214 | $1,807,150 |
| 2019 | $371,983 | $319,518 | $144,627 | $755,908 | $836,128 | $1,592,036 |

Defendant Sekimura is a citizen of Hawai'i.

44.    The defendants identified in ¶¶18, 25, 31, 41-43 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶18-30, 32-41 are referred to herein as the "Director Defendants." The defendants identified in ¶¶21-

22, 24, 33-34, 36 are referred to herein as the "HEI Audit and Risk Committee Defendants." The defendants identified in ¶¶18-24, 32-39, 41 are referred to herein as the "HEI Director Defendants." The defendants identified in ¶¶18-20, 23, 25-30, 32-33, 36, 39-41 are referred to herein as the "HECO Director Defendants." Collectively, the defendants identified in ¶¶18-43 are referred to herein as the "Individual Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

45.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Hawaiian Electric and its shareholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Hawaiian Electric in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hawaiian Electric and not in furtherance of their personal interest or benefit.

46.    To discharge their duties, the officers and directors of Hawaiian Electric were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the safety procedures of the Company. By virtue of such duties, the officers and directors of Hawaiian Electric were required to, among other things:

a.      ensure the Company had appropriate emergency plans in place if a wildfire occurred;

b.      ensure the Company's operations were safe by taking proactive measures, such as burying power lines and replacing power poles;

c.      ensure the Company's procedures for appropriately collecting and preserving evidence of a wildfire scene;

d.      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

e.      remain fully informed regarding the manner in which Hawaiian Electric conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**B.      Breaches of Duties**

47.      The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Hawaiian Electric, the absence of good faith on their part, and a reckless

disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

48.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make materially false and misleading statements and engage in unsafe operations, improper practices that wasted and continue to waste the Company's assets, and caused and continue to cause Hawaiian Electric to incur substantial damage.

49.    The Individual Defendants, because of their positions of control and authority as officers and directors of Hawaiian Electric, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Hawaiian Electric has expended, and will continue to expend, significant sums of money.

## C.    Additional Duties of the HEI Audit and Risk Committee Defendants

50.    In addition to these duties, under its Charter in effect since November 4, 2021, the HEI Audit and Risk Committee Defendants owe and owed specific duties to Hawaiian Electric to assist the Board in overseeing the Company's material risks, including severe weather events, and mitigations to those risks, such as safety plans and procedures when a severe weather event occurs and the proper

maintenance of power poles.[2]   Moreover the HEI Audit and Risk Committee's Charter provides that the HEI Audit and Risk Committee oversee: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) risk management and compliance systems and structure; and (iv) the internal audit function.

51.     Specifically, the HEI Audit and Risk Committee is required to review the Company's financial statements.  In particular, the Charter states:

> Review with management and the independent auditor (a) **major issues regarding accounting principles and financial statement presentations**, including significant accounting policies, any changes in the Company's selection or application of accounting principles and audit conclusions regarding significant accounting estimates, (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's consolidated financial statements, including analyses of the effects of alternative GAAP methods on the consolidated financial statements, (c) any critical audit matters arising from the current audit period, (d) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's consolidated financial statements, and (e) periodic reports from the independent auditor, the internal auditor and management on significant accounting or financial reporting developments in order to assess their impact on the Company.

52.     Regarding risk management, the Charter states that the HEI Audit and Risk Committee is required to:

> 1. **Oversee the enterprise risk management program of the Company, including by (a) reviewing and discussing the Company's major**

---

[2] The HEI Audit and Risk Committee Charter was amended after the wildfires on November 8, 2023.

*financial risk exposures and the steps management has taken to monitor and control such exposures, (b) discussing policies with respect to risk assessment and risk management, including the guidelines and policies governing the process by which risk assessment and risk management is undertaken, and (c) periodically reporting to the Board the Committee's discussion and findings regarding risk oversight so the entire Board can be responsive to changes in the Company's risk profile*.

2. Periodically review the Company's code of conduct (the "Code") and oversee the Company's program and procedures to monitor compliance with the Code, including meeting with the Compliance Officer to discuss potential Code violations that have been reported and the results of the Code compliance program and recommending to the Board proposed revisions to the Code.

53.     The HEI Audit and Risk Committee was authorized to "conduct or authorize investigations into or studies of matters within the Committee's scope of responsibilities."  Despite these responsibilities, the HEI Audit and Risk Committee Defendants failed to prevent the Company from issuing false and misleading statements and failed to ensure that the Company was creating adequate risk mitigation plans for wildfires.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving

rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

55.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Hawaiian Electric, regarding the Individual Defendants' management of Hawaiian Electric's operations, specifically regarding the adequacy of the Company's equipment and safety protocols; and (ii) enhance the Individual Defendants' executive and directorial positions at Hawaiian Electric and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

56.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to conceal the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's inadequate equipment and safety protocols.

57.    The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to fail, purposefully or recklessly, to invest in appropriate equipment repairs and implement

safety protocols in case of a severe weather event and make materially false and misleading statements concerning the Company's preparedness during a severe weather event.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

58.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.    THE INDIVIDUAL DEFENDANTS FAIL TO OVERSEE THE COMPANY'S OPERATIONS

### A.    Hawaiian Electric's Duties as an Electric Utility

59.    Hawaiian Electric holds itself out to shareholders and investors as striving to "be one of the most progressive and highest performing companies in the world, serving the energy needs of each person in Hawaii with purpose, compassion, empathy, and aloha for our fellow humans and our natural environment."

60.    As a utility service with a virtual monopoly in Hawaiʻi, Hawaiian Electric is subject to oversight from both federal and state regulators, including by

- 28 -

the Hawaiʻi Public Utilities Commission ("PUC").  Pursuant to section 8.2 of its General Order No. 7, the PUC requires that Hawaiian Electric "exercise reasonable care to reduce the hazards to which its employees, its customers, and the general public may be subjected."  Further, section 8.3 of its General Order No. 7 states that Hawaiian Electric "shall adopt and execute a safety program fitted to the size and type of its operations."  A failure to conform to or comply with this requirement "shall be subject to a civil penalty not to exceed $25,000 for each day such violation, neglect, or failure continues." Hawaiʻi Revised Statute ("HRS") § 269-28(a). Compliance with the PUC's order is imperative for Hawaiian Electric because failure to do so could lead to significant financial penalties.

61.    Hawaiian Electric had a duty to properly maintain and repair the electric transmission lines, and other equipment, including utility poles associated with their transmission of electricity, and to keep vegetation properly trimmed and maintained so as to prevent contact with overhead power lines and other electric equipment. Hawaiian Electric also had an obligation to comply with statutes, regulations, and standards, specifically, including, but not limited to, HRS § 269-6, HRS § 269-27.6, Hawaiʻi Administrative Rule ("HAR") Chapter 6-73 "Installation, Operation, and Maintenance of Overhead and Underground Electrical Supply and Communication Lines" (adopted 2007), Hawaiʻi PUC, General Order No. 7, National Electrical Code, NFPA No. 70 (2008), National Electrical Safety Code, American National

Standard Code for Electric Meters, ANSI C12, and American Standard Requirements, Terminology, and Test Code for Instrument Transformers, ASA C57.13.  These requirements and obligations were particularly important given the known high risk of fire in Maui in general.

62.     The electric power generation and transmission industry faces inherent hazards because electrical transmission and distribution ("T&D") components are exposed to extreme weather events, including high winds and wildfires.[3]  Thus, it is essential that the Company's T&D components are maintained properly for safety of lives and property.[4]  Failure to do so can increase the risk that a weather event causes a fire, leading to catastrophic harm as it did on Maui.

63.     The Individual Defendants also knew that the Company must follow various standards to protect the public from the consequences that follow from vegetation coming into contact with its T&D components, pursuant to HAR § 6-73-11.  Accordingly, the Company was required to maintain the areas surrounding and adjacent to certain of its T&D components and ensure sufficient clearance around its power lines.  In addition, HAR § 6-73-14 provides that any maintenance issues

---

[3] T&D components include the transmission lines, substations, distribution lines, and transformers.

[4] *See* U.S. Department of Energy, *Quadrennial Technology Review 2015, Transmission and Distribution Components* (2015), https://www.energy.gov/sites/prod/files/2015/09/f26/ QTR2015-3F-Transmission-and-Distribution_1.pdf.

not specifically addressed by HAR § 6-73-11 "should be done in accordance with accepted good practice for the given local conditions known at the time by those responsible for the construction or maintenance." Despite being under an obligation to conform to these minimum safety standards, the Individual Defendants failed to cause the Company to comply with those standards thus placing the public at a heightened risk of wildfires caused by the Company's T&D components.

**B.      The Individual Defendants Knew About the Significant Wildfire Risk Created by the Combination of Hawaiʻi's Severe Weather Events and Old Power Lines**

64.      Every year, multiple brush fires break out across Maui, burning dozens, hundreds, or thousands of acres at a time, as well as, homes, businesses, and personal property. It is impossible to live, work, or own land on Maui without knowing that serious brush fires occur every year and that these fires spread rapidly in Maui's dry, non-native grasses.

65.      Since 2000, more than twenty hurricanes or their remnants have impacted or nearly impacted Hawaiʻi, thirteen of which have occurred since 2010. More recently, dozens of hurricanes or tropical storms made landfall or passed within miles of Hawaiʻi's shores.

66.      In 2014, the Hawaiʻi Wildfire Management Organization ("HWMO") issued a 2014 wildfire mitigation plan that warned Lahaina that it was among Maui's

most fire-prone areas.  The HWMO outlined a plan for working with utilities to help reduce the risk of fires.[5]

67.    Since at least 2018, activists and experts have been sounding the alarm about the fire risk associated with non-native, invasive, and highly flammable grasses, describing the land around Lahaina as a "vast swath of vegetated fuels."[6]

68.    In 2018, and the years following, the HWMO continued to identify Lahaina as a hotspot for potential wildfires due to the area's dry, windy, and hot characteristics.

69.    In 2020, Lahaina was identified as a high risk wildfire area in the Maui County Hazard Mitigation Plan Update.[7]  The Maui County Hazard Mitigation Plan Update also warned that the western portion of Maui has a "Highly Like (greater than 90% annual chance)" probability of experiencing wildfires.

70.    In July 2021, Maui County's Cost of Government Commission ("Commission") issued a Report on Wildfire Prevention and Cost Recovery on Maui

---

[5] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, Wall St. J. (Aug. 12, 2023), https://www.wsj.com/us-news/climate-environment/hawaii-maui-fire-risks-plans-government-e883f3a3.

[6] Imogen Piper, et al., *Maui's Neglected Grasslands Caused Lahaina Fire to Grow with Deadly Speed*, Wash. Post (Sept. 2, 2023), https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/.

[7] County of Maui, Hawai'i, Maui Emergency Management Agency, *Hazard Mitigation Plan Update*, at 489, 503 (August 2020), https://www.mauicounty.gov/DocumentCenter/View/125977/2020-Maui-County-Hazard-Mitigation-Plan-Final.

("Wildfire Prevention Report").[8]  The Commission's Wildfire Prevention Report specifically warned about threats that wildfires posed to Hawaiʻi, and specifically to Maui, stating:[9]

- "[T]he number of incidents from a combination of wild/brush/forest fires appears to be increasing, and that this increase poses an increased threat to citizens, properties, and sacred sites";

- "Island communities are particularly vulnerable because populations tend to be clustered and dependent on single highways, often located on the island edge";

- "Escape routes and evacuation locations and resources for populations impacted by fire incidents are also impeded by fire incursions";

- "Importantly, Hawaii's and Maui's fire problem is more extreme than on the U.S. mainland"; and

- "As of June 22, 2021, the U.S. Drought Monitor designated all of Maui Island as either in a 'moderate drought' or 'severe drought.'"

71.    The Wildfire Prevention Report also included data showing that fires will continue increasing in frequency and severity; exhibits depicting which Maui

---

[8] County of Maui, Hawaiʻi, Cost of Government Commission, *Report on Wildfire Prevention and Cost Recovery on Maui* (July 2021), https://www.mauicounty.gov/DocumentCenter/View /129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB.

[9] *Id.*

communities were the most vulnerable to wildfires (including Lahaina); and the activities that increase wildfire risk (such as power lines).[10]

72.     The Wildfire Prevention Report explained that "[a]boveground power lines that fail, short, or are low hanging can cause fire ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions," which is "exacerbated by overgrown areas in the rights of way beneath the lines."  The Wildfire Prevention Report also identified responsive action to the problems posed by power lines, which included routine inspections of "power transmission lines and rights of way" and tasked the "electric utility companies with corrective actions," like "infrastructure upgrades" and fuel reduction.[11]

73.     The Individual Defendants had specific knowledge of the risk of wildfires on Maui because Hawaiian Electric submitted a 2022 request for funding from the PUC to offset the $189.7 million Hawaiian Electric would need to spend to bolster its power grid statewide, which included wildfire-prevention measures.[12]

---

[10] Hawaii Wildfire Management Association, A *Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaiʻi: 2018–2019 Vegetation Management — Rapid Mapping Assessment and Collaborative Action Planning — Maui Report*, at 2, 7-8 (July 2021), https://www.mauicounty.gov/DocumentCenter/View/129491/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-4-Exhibit-D-25-MB.

[11] County of Maui, Hawaiʻi, Cost of Government Commission, *supra* note 8, at 11-12.

[12] Dan Frosch & Jim Carlton, *supra* note 5.

Indeed, Hawaiian Electric indicated in its funding request that "[t]he risk of a utility system causing a wildfire ignition is significant" and that Hawaiian Electric sought funding, in part, to guard against their facilities being "the origin or contributing source of ignition for a wildfire."[13]

74.    FEMA's April 2023 Wind Retrofit Guide for Residential Buildings in Hurricane-Prone Regions designates the entire state of Hawaiʻi as a hurricane-prone region at risk of high winds.

75.    In a submission from Hawaiian Electric to the PUC, Hawaiian Electric recognized that "the risk of a utility system causing a wildfire ignition is significant."[14]  The Company also told the regulator that it had "reviewed the San Diego Gas and Electric, Southern California Edison, and Pacific Gas & Electric mandated wildfire mitigation plans to identify best practices that would be appropriate for Hawaiʻi's environment and weather conditions."[15]  The Company stated that it "performed assessments of potential wildfire areas on Oʻahu, Maui,

---

[13] Brianna Sacks, *Hawaii Utility Faces Scrutiny for Not Cutting Power to Reduce Fire Risks*, Wash. Post, (Aug. 12, 2023), https://www.washingtonpost.com/ climateenvironment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp _post_most&utm_medium=email &utm_source=newsletter&wpisrc=nl_most.

[14] *In the Matter of Hawaiian Electric Company, Inc., et al.*, Settlement Application at 23 (Haw. PUC June 30, 2022), https://www.hawaiianelectric.com/ documents/about_us/our_vision_and_commitment/resilience/20220630_ resilience_EPRM_application.pdf.

[15] *Id.*

Lāna'i, Moloka'i, and Hawai'i Island."[16]   Hawaiian Electric also advised Hawai'i

regulators that its Wildfire Prevention & Mitigation initiative has the following

objectives:

> 1. Minimize the probability of the Companies' facilities becoming the
> origin or contributing source of ignition for a wildfire;
> 2. Prevent the Companies' facilities from contributing to the severity or
> breadth of wildfires; [and]
> 3. Identify and implement operational procedures to ensure the
> Companies can respond effectively to a wildfire without compromising
> customer and employee safety, while remaining sensitive to customers'
> need for reliable electricity.[17]

76.    Moreover, the Individual Defendants knew that there were previous

fires caused by other electrical utility companies across the country, including

Pacific, Gas & Electric Company ("PG&E") in California, PacifiCorp in Oregon,

and Southern California Edison Company ("SoCal Edison") in California.

77.    As a result, the Individual Defendants were well aware of the wildfire

risks that power lines created in the wildfire prone region of Lahaina.

### C.    Hawaiian Electric Caused a Fire in 2018 by Not De-Energizing Power Lines

78.    The Company had previously caused a wildfire because it failed to de-

energize power lines.  In August 2018, winds from Hurricane Lane blew down a

Hawaiian Electric power line, which ignited a fire that raged in the Kaua'ula Valley

---

[16] *Id.*

[17] *Id.*

in West Maui, uphill from Lahaina.  That fire tore through fallow agricultural land near the same type of fallow agricultural land that fueled the Lahaina Fire.  The Hurricane Lane fires burned 21 houses, 27 cars, and more than 2,100 acres; displaced a few dozen people; and caused more than $4.3 million in damage.[18]

79.     Just days after the Hurricane Lane fires, Maui residents raised many concerns with the then mayor of Maui and state and county officials at a public meeting: "Why didn't Maui Electric shut off the power given the high winds and their equipment having caused other fires?  Why didn't emergency staff sound their all-hazard sirens?"  These questions raise the very same problems that led to and worsened the Lahaina Fire and its attendant impacts.[19]

80.     At the very same 2018 meeting, residents asked state and county officials, "If the winds exceed a certain amount, is Maui Electric required to shut down?"  "Those wires are whipping up there.  And that was the cause of the fire."  Officials responded, "That was not a conversation that was had" and confirmed MECO did not have a protocol in place to shut down power in advance of high winds.

---

[18] Brianna Sacks & Justine McDaniel, *A Terrifying Fire Struck Maui in 2018. Officials Were Warned of a Repeat*, Wash. Post (Aug. 22, 2023), https://www. washingtonpost.com/weather /2023/08/22/maui-fire-2018-lahaina-warning/.
[19] *Id.*

81.    In 2020, researchers from the University of Hawaiʻi and the East-West Center connected the 2018 fires on Maui and Oʻahu to winds from Hurricane Lane. That 2020 report, titled "Fire and Rain: The Legacy of Hurricane Lane in Hawaiʻi," published in the *American Meteorological Society's Journal*, found that neither thunderstorms nor lightning started the 2018 fires on Maui and Oʻahu.  The Honolulu Fire Department attributed the Oʻahu fire to power lines arcing in Hurricane Lane's high winds.

82.    Hawaiian Electric still did not have a protocol in place to shut down the power during high winds, five years later when the Lahaina Fire struck.

**D.    The Company Failed to Remove Old Power Poles Before the Fire**

83.    The Company failed to remove old power poles that posed a danger to public safety.  In April 2018, Hawaiian Electric Company applied to the PUC to transfer ownership of the utility poles (which was approved in October 2018) from Hawaiian Telecom, Inc.  As part of the transfer Hawaiian Electric Company agreed removal of certain abandoned utility poles (also known as "double poles,") it acquired from Hawaiian Telecom, Inc.   Poles are usually abandoned when they become damaged.  Double poles are a public safety hazard because the abandoned pole is left in place and they are susceptible to falling.  Hawaiian Electric Company committed to: (i) conduct a six-month field survey of approximately 14,000 double poles that exist in its service territory; (ii) perform a minimum of 1,000 standard

transfers and double pole removals per year; and (iii) bring the double pole backlog to a net zero within ten years.  Following its field survey, Hawaiian Electric Company identified approximately 9,400 double poles that it was responsible to replace.

84.    Hawaiian Electric Company utterly failed to fulfill its obligations. Dean Nishina, then Acting Executive Director for Hawaiʻi's Department of Commerce and Consumer Affairs, Division of Consumer Advocacy, testified on March 29, 2023, to the Hawaiʻi State House Committee on Consumer Protection & Commerce that Hawaiian Electric Company had only removed 2,547 double poles (leaving 6,853 still to be removed).  In other words, in the five years following approval of the transfer, Hawaiian Electric Company failed fulfill its commitment to replace at least 1,000 transfers/double pole removals per year and has only removed approximately 27% of the double poles that the Company agreed should be removed.

85.    In addition to the admitted risks arising from not removing double poles, the Company's other power poles needed to be replaced.  The Company's 60,000 poles were vulnerable due to their age and the fact that Hawaiʻi is in a "severe wood decay hazard zone."  The Company had not replaced the aged wooden poles and acknowledged the "serious public hazard" if the poles failed.  These poles, according to the *Associated Press*, were built to an "obsolete 1960s standard" and were leaning and near the end of their life span before the Lahaina fire.

86.     The Company admitted in its 2022 PUC application that it needed funds to strengthen electrical poles and that $6.2 million would be required for "Wildfire Prevention & Mitigation" on Maui, and that $40 million in capital improvements and repairs would be needed to help prevent wildfires more generally on Maui.

### E.     The Individual Defendants Repeatedly Failed to Implement Adequate Protections

87.     Despite years of warnings, Hawaiian Electric never implemented the most basic fire mitigation strategies adopted by other power transmission companies.  For example, other utility companies employed power shutoff systems to protect against wildfires in high winds; Hawaiian Electric failed to implement the same.  The practice of de-energizing power lines is standard practice during severe weather conditions in the Western United States.  California utilities, such as SoCal Edison, PG&E, and San Diego Gas & Electric, have all implemented Public Safety Power Shutoff ("PSPS") plans during red flag and high wind events.  These utilities have implemented PSPS plans for years to prevent wildfires.

88.     The Individual Defendants failed to create a PSPS plan.[20]  According to the *Washington Post*, the Company was "aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire

---

[20] The Individual Defendants also knew that the Company did not use any wildfire prevention technologies on its T&D components, such as covered conductors, underground power lines, composite power lines, and non-expulsion fuses, thus increasing the risk of causing a wildfire.

mitigation plans, according to [Hawaiian Electric] and two former power and energy officials." The Individual Defendants knew, or should have known, shutting off power is "a successful way to prevent wildfires when additional robust techniques are not in place."[21]

89.    According to the *Washington Post*, Hawai'i is powered by a grid that uses "[o]ld wooden poles [that] are largely uninsulated and strung with lush vegetation over miles of rugged terrain, according to utility specialists," and "residents and energy experts said they have long called for the utility to harden its grid, and despite the cost, to put more of it underground."[22]

90.    Unfortunately, the Individual Defendants did not implement a PSPS plan prior to the Lahaina Fire which led to power lines being energized during high winds. The energized power lines created wildfires that ravaged Lahaina.

**F.    The Individual Defendants' Failure to Implement Adequate Protocols and Procedures Caused the Company to Ignore Local Fire Warnings**

91.    On August 4, 2023, the NWS in Honolulu posted on X (formerly known as Twitter), that Hawai'i could experience "indirect impacts" from Hurricane Dora from August 7, 2023 through August 9, 2023, including "[s]trong and gusty trade winds" and "[d]ry weather [and] high fire danger."

---

[21] Brianna Sacks, *supra* note 13.

[22] *Id.*

92.    On August 6, 2023, the NWS issued a fire weather watch and posted a warning on X, indicating the following: "Strongest winds in yellows [and] oranges on map result from significant pressure differences between high [and] low-pressures. Combined [with] dry conditions, these winds pose a serious fire [and] damaging wind threat. Stay alert!"  Also, the NWS posted an update on Hurricane Dora on X, which included the following warning: "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it [and] the high pressure to the north creates a threat of damaging winds [and] fire weather (due to ongoing dry conditions) from early Mon[day] to Wed[nesday]."

93.    On August 7, 2023, the NWS issued an updated warning for the Hawaiian Islands, as reported in the *Maui News*.  This warning contained both a high wind watch and a fire warning for the leeward sides of the state, which included Lahaina, Maui.  The warning cautioned that damaging and powerful winds could knock down power lines and that any fires that could develop would likely spread rapidly.

94.    On August 8, 2023, the NWS issued both a high wind warning and Red Flag Warning for portions of the Hawaiian Islands, including West Maui.  The NWS issued a "Red Flag" Warning that there was a "[h]igh fire danger with rapid spread."  According to the NWS, a Red Flag Warning "means that critical fire weather conditions are either occurring now or will shortly.  A combination of strong winds,

low relative humidity, and warm temperatures can contribute to extreme fire behavior."

95.    Despite these warnings, the Company left the power lines energized.

**G.    The Devastating Fires**

96.    On August 8, 2023, a wildfire broke out in Maui when power lines belonging to Hawaiian Electric fell down in high winds.  This wildfire ultimately led to over 100 confirmed deaths and between $4 billion to $6 billion in property damage.

97.    These fires included the first fire, called the "Olinda Fire," which started in Kula in the evening of August 7, 2023; the second fire, the "Lahaina Fire," which started near Lahaina in the morning of August 8, 2023; and the third fire, the "Kula Fire," which also started in the Kula area, beginning in the morning on August 8.  The most destructive of the Maui fires was the Lahaina Fire.  The Lahaina Fire started in the morning of August 8, 2023, and destroyed thousands of acres of land and thousands of structures.  The financial devastation from the Maui fires was so severe that the State of Hawaiʻi's Department of Business, Economic Development and Tourism revised its economic growth projections for the State of Hawaiʻi in 2023 and 2024 downward (from 1.8% to 1.1% for 2023 and 2% to 1.5% for 2024) primarily because of the impact of the fires.

H.      **The Individual Defendants Failed to Preserve Evidence After the Maui Fires**

98.     Starting around August 12, 2023, Hawaiian Electric moved evidence from the fires before the ATF could investigate the cause of the fires.  The Company hauled away fallen poles, power lines, transformers, conductors, and other equipment from the area surrounding its Lahaina substation.

99.     The Company's actions likely violated national guidelines on how to handle and preserve evidence after a wildfire which deprived investigators the opportunity to view any poles or downed lines in an undisturbed condition before or after the fire started, according to court documents, letters, and other records obtained by the *New York Post*.[23]

100.    Hawaiian Electric spokesman Darren Pai admitted that the Company removed evidence from the sites of the Maui fires, but claimed that the evidence had been ""carefully photographed, documented and stored.""[24]   However, carefully photographing evidence and then moving does not comply with applicable standards and interferes with an investigation by disturbing the fire scene and the physical evidence present.

---

[23] Melissa Koenig, *Hawaii Power Company May Have Compromised Evidence in Probe of Deadly Maui Fire: Report*, N.Y. Post (Aug. 24, 2023), https://nypost.com/2023/08/24/hawaiian-electric-removed-evidence-from-scene-of-blaze-report/?utm_source=ground.news&utm_medium =referral.

[24] *Id.*

101.    When ATF arrived to help determine the origin and cause of the wildfires, the Company's crews had cleared much of the site near the substation off Lahainaluna Road and moved damaged equipment to a warehouse under the Company's control.

102.    Hawaiian Electric issued a statement indicating that it would "take reasonable steps to preserve evidence but cannot make any guarantees due to the rapidly evolving situation on the ground, which also is not within our control."[25] There is a strict process for how utilities should handle the site where a fire started. The National Fire Protection Association guidelines state that "***the integrity of the fire scene needs to be preserved***" and "***evidence should not be handled or removed without documentation***" and the scene cordoned off with tape or flags.[26]

103.    The Individual Defendants were aware that other utility companies have been fined for mishandling evidence after a fire.  California utility officials fined PG&E and SoCal Edison for altering or not properly preserving evidence after a fire before investigators arrived.  PG&E is not the only utility that has faced legal troubles for removing evidence from a fire scene.  After a disastrous spate of fires in Oregon in 2020, a class-action lawsuit was filed against PacifiCorp for the blazes.

---

[25] *Id.*

[26] *Id.*

The case focused on the utility's destruction of evidence.  A jury found the utility had played a significant role in starting those blazes and owed plaintiffs $73 million.

104.   In 2022, Hawaiian Electric stated that it was familiar with PG&E's catastrophic losses and fines, noting in a regulatory filing that utility companies can be held liable when it comes to sparking or spreading a wildfire and citing PG&E's "$15 billion settlement" with victims as an example.[27]  "The risk of a utility system causing a wildfire ignition is significant," the Company wrote.  As a result, the Individual Defendants were well aware of the risks the Company faced for failing to preserve evidence.

## VII.   IMPROPER STATEMENTS

105.   In addition to failing to impose appropriate controls to minimize the likelihood of harm from severe weather events, the Individual Defendants misled the public regarding the Company's readiness for such events.  From February 28, 2019 through August 7, 2023, the Individual Defendants either made or caused the Company to make materially false and misleading statements concerning the Company's: (i) risk mitigations; (ii) adherence to ESG principles; (iii) safety protocols and procedures; and (iv) maintenance of its equipment.  In truth, the Company had not: (i) taken appropriate measures to mitigate risk; (ii) adhered to

---

[27] *In the Matter of Hawaiian Electric Company, Inc., et al.*, *supra* note 14.

ESG principles; (iii) created and implemented adequate safety protocols and procedures; and (iv) adequately maintained its equipment.

106.   On February 28, 2019, Hawaiian Electric filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10-K") with the SEC.  The 2018 Form 10-K provided an overview of the Company, which stated that the Company's goals included meeting the needs and expectations of its customers:

> *Electric Utility.* Hawaiian Electric and its operating utility subsidiaries, Hawaii Electric Light Company, Inc. (Hawaii Electric Light) and Maui Electric Company, Limited (Maui Electric), are regulated electric public utilities that provide essential electric service to approximately 95% of Hawaii's population through the operation of five separate grids that serve communities on the islands of Oahu, Hawaii, and Maui, Lanai and Molokai. Hawaiian Electric's mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy. The goal is to create a modern, flexible and dynamic electric grid that enables an optimal mix of distributed energy resources (such as private rooftop solar and battery storage), demand response, and grid-scale resources to achieve the statutory goal of 100% renewable energy by 2045.

107.   The 2018 Form 10-K also discussed the Company's response to environmental conditions:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric [the "Utilities"], like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report

*... the Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric.*

108.   On March 25, 2019, the Company filed its Proxy Statement on Form DEF 14A (the "2019 Proxy") with the SEC, solicited by defendants Lau, Watanabe, Dahl, Fargo, Fowler, Russell, and Taniguchi.  The 2019 Proxy touted the Company's improvements to its products to enhance customers' lives and "protect Hawaii's unique environment."  The 2019 Proxy also stated that the Board spends a significant amount of time managing risks:

**<u>Culture and Our Teammates</u>**

We are dedicated to creating a better Hawaii. We reflect this commitment through our efforts to provide products and services that enhance our customers' lives, and in our work to protect Hawaii's unique environment, strengthen our economy, support our communities and act with integrity and accountability.

Our board oversees and works with management to find and cultivate the talent our organization needs to continue delivering value for our shareholders, customers and communities. Our employees are committed to the company's foundational values: integrity, excellence, aloha and safety.

*                   *                   *

**<u>Our Focus on Risk Oversight</u>**

The board spends a significant time on risk oversight. We have a board approved consolidated enterprise risk management system designed to identify and assess risk across the HEI enterprise and report risks to the board, along with proposed strategies for mitigating such risks.

> At least annually, the board conducts a strategic planning and risk review, during which we evaluate the company's fundamental financial and business strategies and assess major risks facing the company and options to mitigate those risks.

109.   On May 7, 2019, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC.  On August 2, 2019, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.  On November 1, 2019, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2019 (the "Q3 2019 Form 10-Q") with the SEC.  The Q1 2019 Form 10-Q, Q2 2019 Form 10-Q, and Q3 2019 Form 10-Q contained substantively similar descriptions of the Company's environmental strategy for its electric utility segment as discussed in the 2018 Form 10-K.

110.   On February 28, 2020, Hawaiian Electric filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 Form 10-K") with the SEC.  The 2019 Form 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, and executive overview and strategy of its electric utility segment as discussed in the 2018 Form 10-K.  Additionally, in discussing the Company's ESG risks and opportunities, the 2019 Form 10-K stated that the Board oversees the Company's enterprise risk management ("ERM") programs, which address all material risks, including ESG considerations.  In particular, the 2019 Form 10-K stated:

[ESG] considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii" for the benefit of all stakeholders. The Company firmly believes that effective management of its ESG risks and opportunities creates a strategic business advantage; improves the lives of our employees, through focus on employee health, wellness, safety, empowerment and increased engagement; improves the sustainability, well-being and resilience of our communities, the state and the environment; and ultimately leads to sustained long-term value creation for our investors.

***The HEI Board of Directors is responsible for the oversight of the Company's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations***. The Board of Directors has delegated the day-to-day responsibility to execute on these action plans to management. The Company believes ESG considerations are embedded in our daily actions and drive how we engage with our employees, communities, and shareholders.

The Company intends to leverage the frameworks developed by the Task Force on Climate-related Financial Disclosure (TCFD) and the Sustainability Accounting Standards Board (SASB) to communicate our approach and progress on ESG matters in future filings.

We are committed to achieving a renewable, sustainable energy future, providing leadership in corporate social responsibility, and adhering to governance best practices.

111.   On March 26, 2020, the Company filed its Proxy Statement on Form DEF 14A (the "2020 Proxy") with the SEC, solicited by defendants Lau, Watanabe, Connors, Dahl, Fargo, Fowler, Kāne, Powell, Russell, Scilacci, and Zlotnicka.  The 2020 Proxy assured investors that the Company's ESG responsibilities are an integral part of its strategies and that the Board's risk oversight address all material risks.  In particular, the 2020 Proxy stated:

## Board Oversight of Strategy and Risk Management: Investing in Hawaii's Sustainable Future

Sustainability, or environment, social and governance (ESG), considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii." We firmly believe that effective management of ESG risks and opportunities creates a strategic business advantage; improves the sustainability, well-being and resilience of our communities, our state and our environment; and leads to sustained long-term value creation for our investors.

The Board is responsible for the oversight of HEI's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations.

*    *    *

This past year, our Board prioritized integrating sustainability even further into our governance structures, decision-making processes and reporting. We focused our strategic retreat on climate change and other ESG factors relevant to our companies. Since then, the HEI companies have been further integrating climate change and ESG factors into strategic planning and ERM processes.

112.   On May 5, 2020, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2020 (the "Q1 2020 Form 10-Q") with the SEC.  On August 6, 2020, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2020 (the "Q2 2020 Form 10-Q") with the SEC.  The Q1 2020 Form 10-Q and Q2 2020 Form 10-Q contained substantively similar descriptions of the Company's environmental strategy for its electric utility segment as discussed in the 2018 Form 10-K.

113.   On September 15, 2020, Hawaiian Electric issued a press release announcing that the Company had released its first ESG Report (the "2019 ESG

Report").  The press release stated that the Company's strategies and operations were

creating long-term value for stakeholders.  In particular, the press release stated:

> Hawaiian Electric ... today released its first consolidated report
> describing its policies, actions and performance data with respect to
> [ESG] and sustainability-related matters. Such reports are frequently
> referred to as "ESG" reports and are becoming increasingly common as
> investors seek to understand how public companies are impacting the
> environment and society, as well as potential opportunities and risks to
> companies' long-term financial and operational strength.

> "We're proud to issue our first consolidated HEI ESG report to help
> customers, employees, investors and other stakeholders understand
> how HEI's strategies and operations advance ESG outcomes and create
> long-term value for all stakeholders," said [defendant Lau].

> "While this is our first consolidated HEI ESG report, ESG principles
> and sustainability have long been fundamental values of HEI, so much
> so that we've often said that ESG is in our DNA.  With all of our
> operations in the middle of the Pacific Ocean, we know that our
> company's longterm health is inextricably linked with the strength of
> the economy, communities, and environment of the Hawaiian Islands.
> This linkage is all the more clear in the context of the COVID-19
> pandemic, and we're working hard to help our customers, employees
> and communities through this period and to help our economy recover,"
> said Lau.

114.  That same day, the Company published the 2019 ESG Report, which

touted the Company's sustainability governance and assured that safety risks were

monitored and mitigated against.  In particular, the 2019 ESG Report stated:

> We see ESG-related strategies and risks as having the same potential as
> other strategies and risks to impact long-term value creation. As such,
> we've integrated material ESG factors into company governance
> structures and management activities. Just like other strategies and
> risks, we're identifying, measuring, managing and assigning
> accountability for material ESG issues.

*Company strategies are overseen by the Board as a whole and are managed through our strategic planning and oversight process*. The Board provides guidance on strategic priorities and plans, including at its annual strategic retreat, and approves the budget to allocate resources for agreed upon strategies.

*Our full Board reviews and provides input on major risks for our companies and determines our risk appetite. This includes risks relating to safety and potential physical risk to utility infrastructure or to bank loan collateral from climate change impacts. The HEI Audit & Risk Committee assists the Board in its risk oversight role by overseeing our Enterprise Risk Management (ERM) program, which is designed to identify and assess key risks across the HEI enterprise and report such risks to the Board, along with strategies for mitigating such risks*. The Hawaiian Electric *Audit & Risk Committee and the ASB Audit Committee and Risk Committee assist in risk oversight of those subsidiaries*.

The HEI Nominating & Corporate Governance Committee (NCG Committee) reviews strategies and risks involving governance and assesses leadership development and succession planning to ensure we have the right leadership to execute our strategies. The role of the NCG Committee has recently expanded to include review of human capital management and ensuring ESG oversight.

115.   The 2019 ESG Report also touted the Company's environmental commitment and "year-round" risks assessments, stating:

Our customers and communities expect that through our daily operations we will protect our air and water, reduce waste, and conserve natural resources. More than 30 environmental professionals, including scientists, engineers, chemists, and a wildlife biologist work full-time at our company to ensure that employees and external contractors understand and comply with all applicable environmental laws, regulations, permitting requirements and procedures regarding air and water quality, noise control, hazardous materials, and protected species.

Our Environmental Division's mission is to ensure that the company fulfills its kuleana, responsibility, to protect Hawai'i's unique environment through environmental compliance and stewardship and timely, innovative, cost-effective Environmental Management Programs and Standard Operating Procedures, which are comprehensive and formalized.

Critical elements of the programs and procedures include year-round risk and opportunities assessment, continuous improvement, compliance management and tracking, air and water quality monitoring, and extensive environmental compliance training in air quality requirements, spill prevention control and countermeasures, storm water runoff, proper handling and disposal of hazardous materials, and protected species awareness and protection. All contractors and subcontractors working at Hawaiian Electric sites are required to attend Contractor Environmental Orientation training, conducted by our environmental staff.

Internal audits are conducted to verify compliance with environmental permits, regulations and policies, and fulfill corporate risk management requirements. Our internal Corporate Audit Team audits the Environmental Division at least once every three years. Audit reports are used to create Management Action Plans, ensuring that highest risk items are given priority and addressed in a timely manner. The Environmental Division also performs periodic environmental compliance audits of our company facilities to identify areas for improvement.

116. The 2019 ESG Report also discussed the Company's purported commitment to safety, including the Company's emergency plans, stating:

Safety is our number one priority at Hawaiian Electric. Our goal is to provide a safe and healthy work environment, where every employee makes safety a central part of his or her job.

Our safety commitment is to provide and support:

• Managerial responsibility for health and safety issues
• Procedures for hazard identification and safety risk assessment

- Operating health and safety guidelines, procedures, and policies
- ***Emergency planning and preparedness procedures***
- Safety performance monitoring, measurement, and reporting
- Internal and external health and safety audits

117.   On November 6, 2020, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2020 (the "Q3 2020 Form 10-Q") with the SEC.  The Q3 2020 Form 10-Q contained a substantively similar description of the Company's environmental strategy for its electric utility segment as discussed in the 2018 Form 10-K.

118.   On February 26, 2021, Hawaiian Electric filed its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K") with the SEC.  The 2020 Form 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed in the 2018 Form 10-K.

119.   On March 26, 2021, the Company filed its Proxy Statement on Form DEF 14A (the "2021 Proxy") with the SEC, solicited by defendants Lau, Fargo, Connors, Dahl, Fowler, Kāne, Powell, Russell, Scilacci, and Zlotnicka.  The 2021 Proxy continued to assure investors that the Board considered ESG factors when overseeing the Company's operations, stating:

> We firmly believe that effective management of ESG risks and opportunities creates a strategic advantage; improves the sustainability,

well-being and resilience of our communities, our economy and our environment; and leads to sustained long-term value creation for our investors.

\*      \*      \*

In 2020, our Board fully integrated material ESG factors into the company's governance structures and oversight of management activities.   We expanded the responsibilities of the Nominating & Corporate Governance Committee to include overseeing human capital management and ensuring all material ESG areas have appropriate oversight.

\*      \*      \*

The new performance-based regulation (PBR) framework, developed with our regulators and stakeholders, further incentivizes the utility to achieve ESG outcomes relating to increasing renewable energy, facilitating customer participation in the clean energy transition, modernizing our grid and advancing affordability and customer equity.

120.   On April 22, 2021, Hawaiian Electric issued a press release announcing that the Company had issued a consolidated ESG Report (the "2020 ESG Report"). The press release stated that the Company considered "climate-related factors" into its governance, strategies, and risk management.  In particular, the 2020 ESG Report stated:

Hawaiian Electric ... today released an updated consolidated report describing its policies, actions and performance with respect to a number of [ESG] matters, including climate-related risks and opportunities.

\*      \*      \*

"With all of our operations in the middle of the Pacific Ocean, we know that our company's long-term health is inextricably linked with the

strength of the economy, communities, and environment of the Hawaiian Islands. That's why ESG and sustainability considerations are at the core of our mission to be a catalyst for a better Hawai'i," said [defendant Lau].

"Since issuing our inaugural ESG report last fall, we have continued our cross-enterprise work to further integrate ESG and climate-related factors into our governance, strategies, risk management and reporting. This second consolidated ESG report provides an update on our ESG efforts and reflects our commitment to continuous improvement, transparency and accountability surrounding these very important issues," said Lau.

121.    That same day, Hawaiian Electric published the 2020 ESG Report. The 2020 ESG Report contained substantively similar descriptions of the Company's sustainability governance, commitment to environmental compliance, and emergency planning and preparedness procedures as discussed in the 2019 ESG Report.

122.    On May 10, 2021, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2021 (the "Q1 2021 Form 10-Q") with the SEC. On August 9, 2021, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2021 (the "Q2 2021 Form 10-Q") with the SEC. On November 5, 2021, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2021 (the "Q3 2021 Form 10-Q") with the SEC. The Q1 2021 Form 10-Q, Q2 2021 Form 10-Q, and Q3 2021 Form 10-Q contained substantively similar descriptions of the Company's

environmental strategy for its electric utility segment as discussed in the 2018 Form 10-K.

123.   On February 25, 2022, Hawaiian Electric filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 Form 10-K") with the SEC.  The 2021 Form 10-K contained a substantively similar description of the Company's overview of its operations and environmental strategy for its electric utility segment as discussed in the 2018 Form 10-K.  The 2021 Form 10-K also contained substantively similar descriptions of the Company's purported commitment to ESG as discussed in the 2019 Form 10-K.

124.   On March 18, 2022, the Company filed its Proxy Statement on Form DEF 14A (the "2022 Proxy") with the SEC, solicited by defendants Seu, Fargo, Connors, Dahl, Flores, Fowler, Kāne, Russell, and Scilacci.  The 2022 Proxy assured investors that the Board provided input on the Company's major risks, including safety, stating:

> Effective management of risks and opportunities improves the sustainability, well-being and resilience of our communities, our state and our environment…
>
> As a Board, we see ESG-related strategies and risks as having the same potential as other strategies and risks to impact long-term value creation.  As a result, we deliberately composed our Board to ensure we have directors who have direct experience related to ESG topics, including renewable energy, climate change strategy and environmental management.

> ***Our full Board reviews and provides input on our strategies and major risks and determines our risk appetite****. **This includes risks relating to safety***, other human capital considerations and climate change.

*     *     *

> **Hawaiian Electric** – Focused on achieving aggressive climate goals in a way that is affordable, reliable and resilient for our customers.

125.   On April 12, 2022, Hawaiian Electric issued a press release announcing that the Company had issued a consolidated ESG Report (the "2021 ESG Report"). The press release quoted defendant Seu, who touted the Company's purported commitment to operating sustainably and commitment to ESG principles stating, "[o]ur ESG progress demonstrates our commitment not only to operating a sustainable business, but also to building a sustainable Hawai'i in which our children and grandchildren, our communities, our customers and our fellow employees will thrive together now and for generations to come," and "[o]ur company has been serving Hawai'i for over 130 years, and this deep-felt mindset comes naturally to us as a longstanding business in our island state. The alignment between ESG principles, state policy in Hawai'i, community expectations, and our goals as a company has never been stronger."

126.   That same day, Hawaiian Electric published the 2021 ESG Report.  The 2021 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental

- 59 -

management, and purported commitment to safety as discussed in the 2019 ESG Report.  Additionally, the 2021 ESG Report touted the Company's ability to develop damage prediction models for severe natural events in order to support planning efforts.  In particular, the 2021 ESG Report stated:

> We are focused on ensuring the resilience of our system. Our efforts include:
>
> - Using advanced climate risk modeling to assess risks and inform our planning process
>
> - Deploying advanced meters and other technologies that allow us to respond more quickly to system interruptions
>
> - ***Developing damage prediction modeling to estimate damage and outages from severe natural event scenarios in order to support resilience planning efforts***
>
> - Developing plans for community microgrids and/or critical customer hubs to be able to quickly restore power to critical customers
>
> - Building more modern and efficient power plants inland, away from the coastline. An example is the Schofield Generating Station, which was completed and brought online in 2018. The biofuel-capable generating facility is located on military property inland at a higher elevation. It can be isolated to serve the military base and other critical facilities in the event of an emergency, and feeds electricity to the grid that serves all Oʻahu customers the rest of the time.
>
> - Collaborating with key partners, such as the military, to supply energy to customers during an emergency

- Engaging with stakeholders to incorporate resilience needs and priorities through our Integrated Grid Planning process, including its Resilience Working Group

*    *    *

We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen. We regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines. We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

We're working to reduce the impact of outages by adding devices to section off parts of the grid to reduce the number of customers affected by an outage. We have also completed distribution protection studies to improve safety and mitigate risk on each of the five islands we serve. We measure and report reliability performance using metrics commonly used in the electric utility industry regarding the duration and frequency of power interruptions for customers. Both the company (through performance incentives) and executives (through executive compensation goals) have financial incentives to promote strong reliability performance.

We are working on a multi-year plan and PUC application focused on foundational investments in transmission and distribution system resilience. Our proposed plan will include:

- Strengthening our most critical transmission lines to withstand extreme winds

- Hardening distribution lines serving critical community lifeline facilities such as hospitals, military sites, communications infrastructure, water and wastewater facilities, ports and emergency response facilities

• Upgrading specific poles to improve restoration after a storm or hurricane

• Moving lines underground in targeted areas prone to vegetation-related damage

• Removing large trees that are at risk of falling into lines during a storm

• ***Strengthening lines and deploying devices to help prevent and respond to wildfires***

• Installing equipment in select substations to reduce flood impacts

127.   The 2021 ESG Report also assured shareholders that the Company had

wildfire mitigations in plans in place that would help prevent and mitigate wildfires

in the areas the Company serviced:

> Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in Hawaii.  98% of wildfires in Hawaiʻi are human caused and the threat to communities is high year-round.  ***In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas***.
>
> As members of the Waiʻanae Wildfire Hui in West Oʻahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects.  We support the Hawaiʻi Wildfire Management Organization on Hawaiʻi Island, which works with communities across the state on wildfire planning, prevention and mitigation activities.  By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawaiʻi and build strong, resilient communities.

128.   On May, 9, 2022, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2022 (the "Q1 2022 Form 10-Q") with the SEC.  On August 8, 2022, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2022 (the "Q2 2022 Form 10-Q") with the SEC.  On November 7, 2022, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2022 (the "Q3 2022 Form 10-Q") with the SEC.  The Q1 2022 Form 10-Q, Q2 2022 Form 10-Q, and Q3 2022 Form 10-Q contained substantively similar descriptions of the Company's strategy for its electric utility segment as discussed in the 2018 Form 10-K.

129.   On February 27, 2023, Hawaiian Electric filed its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K") with the SEC.  The 2022 Form 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment as discussed in the 2018 Form 10-K.  The 2022 Form 10-K also contained substantively similar descriptions of the Company's purported commitment to ESG as discussed in the 2019 Form 10-K.

130.   On March 24, 2023, the Company filed its Proxy Statement on Form DEF 14A (the "2023 Proxy") with the SEC, solicited by defendants Seu, Fargo, Connors, Dahl, Flores, Fowler, Kāne, Kennedy, Otani, Russell, and Scilacci.  The

2023 Proxy continued to assure investors that the Board provided input on the Company's major risks, including safety.  In particular, the 2023 Proxy stated:

### Board Oversight of Strategy and Risk Management

Effective management of risks and opportunities leads to sustained long-term value creation for our investors and improves the sustainability, well-being and resilience of our communities, our state and our environment.

***Our full Board reviews and provides input on our strategies and major risks and determines our risk appetite.  This includes risks relating to a number of topics, including but not limited to, safety***, other human capital considerations and climate change.

\*       \*       \*

As a Board, we consider ESG-related strategies and risks in the context of our overall company strategies and risks.  As such, we have integrated oversight of ESG risks and opportunities into our existing Board and committee responsibilities. In considering our Board composition, we also ensure we have directors who have direct experience related to ESG topics relevant to our strategies, including renewable energy, climate change strategy and environmental management.

\*       \*       \*

HEI's Enterprise Risk Management (ERM) function is principally responsible for identifying and monitoring risk at the holding company and its subsidiaries, and for reporting on high-risk areas to the Board and designated Board committees.  As a result, all HEI directors, including those who serve on the Compensation & Human Capital Management Committee, are apprised of risks that could reasonably be expected to have a material adverse effect on HEI.

131.   On April 4, 2023, Hawaiian Electric issued a press release announcing that the Company had released its consolidated ESG Report (the "2022 ESG

Report").   The press release touted the Company's purported commitment to reliability and assured that policies have been updated and actions have been taken in response to ESG matters:

> Hawaiian Electric ... today announced the publication of its newest consolidated report describing its updated policies, actions and performance for 2022 with respect to a range of environmental, social and governance (ESG) matters.   This is HEI's fourth annual ESG report.
>
> "Our HEI family of companies is guided by a common purpose to create a better Hawai'i – one that is thriving economically, environmentally, culturally and socially," said [defendant Seu].   "We believe this purpose serves the long-term interests of all of our stakeholders – it inspires us to act in ways that allow us not simply to advance, but to leap forward into a future that's brighter for us all."
>
> The theme of HEI's latest ESG report is "Laulima," which translates to "many hands working together."   The report details the work of all of the HEI companies in 2022 toward their common purpose, including in areas such as decarbonization; economic health and affordability; reliability and resilience; diversity, equity and inclusion; and human capital management.

132.   That same day, the Company published the 2022 ESG Report which contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, purported commitment to safety, reliability and resilience, and wildfire prevention and mitigation, as discussed in the 2019 ESG Report and the 2021 ESG Report.

133.   On May 9, 2023, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2023 (the "Q1 2023 Form 10-Q") with

the SEC.  On August 7, 2023, Hawaiian Electric filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2023 (the "Q2 2023 Form 10-Q") with the SEC.  The Q1 2023 Form 10-Q and Q2 2023 Form 10-Q contained substantively similar descriptions of the Company's strategy for its electric utility segment as discussed in the 2018 Form 10-K.

134.   The above statements from February 28, 2019 through August 7, 2023 were materially false and misleading.  In these false and misleading statements the Individual Defendants repeatedly touted the Company's risk mitigations, adherence to ESG principles, and emergency planning.  The Individual Defendants also failed to disclose material adverse facts about the Company's operations, including the failure to maintain equipment and lack of adequate safety protocols.

## VIII.  THE TRUTH EMERGES

### News Reports Reveal that Hawaiian Electric Did Not Cut the Power and Failed to Properly Maintain Equipment and Safety Protocols

135.   Media outlets and wildfire experts have placed the blame squarely on Hawaiian Electric for causing and aggravating the harm from the Maui wildfires. On August 8, 2023, Hawaii News Now reported that "[m]ore than 30 downed power poles" were "reported on Maui."[28]   Maui Now reported that the Company was

---

[28] Kiana Kalahele, *More than 30 Downed Power Poles Reported on Maui; Thousands Without Power*, Hawaii News Now (Aug. 8, 2023), https://www.hawaiinewsnow.com/2023/08/08/strong-winds-knock-out-power-thousands-statewide/.

working to restore power to over 12,000 customers and reminded readers that they should assume a downed power line "is energized and dangerous."[29]

136.   Michael Wara, a wildfire expert who directs the Climate and Energy Policy Program at Stanford University, said that the pattern of the Lahaina Fire "suggests that a spate of small ignitions combine to form a bigger blaze" and "the only real source of that is power lines."[30]  On August 12, 2023, media outlets began reporting that the Company did not have a plan to shut off power in advance of the wildfires.  The *Washington Post* published an article titled, "Hawaii utility faces scrutiny for not cutting power to reduce fire risks."  The article stated that a shut off plan was not included in the Company's fire mitigation plans.  In particular, the article stated:

> Four days before fast-moving brush fires engulfed parts of Maui, weather forecasters warned authorities that powerful wind gusts would trigger dangerous fire conditions across much of the island and Hawaii.
>
> The state's electric utility responded with some preemptive steps but did not use what is widely regarded as the most aggressive but effective safety measure: shutting down the power.
>
> Hawaiian Electric, the utility that oversees Maui Electric and provides service to 95 percent of the state's residents, did not deploy what's

---

[29] Maui Now News, *High Winds Result in Power Outages to Thousands in West Maui, Olinda- Piʻiholo*, Maui News (Aug. 8, 2023), https://mauinow.com/ 2023/08/08/high-winds-result-in-power-outages-in-west-maui-olindapi%CA% BBiholo-and-moloka%CA%BBi/.

[30] Brianna Sacks, *supra* note 13.

known as a "public power shutoff plan," which involves intentionally cutting off electricity to areas where big wind events could spark fires. A number of states, including California, have increasingly adopted this safety strategy after what were then the nation's most destructive and deadliest modern fires, in 2017 and 2018.

*Hawaiian Electric was aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to the company and two former power and energy officials interviewed by The Washington Post. Nor, in the face of predicted dangerous winds, did it act on its own, utility officials said, fearing uncertain consequences*.

*The decision to avoid shutting off power is reflective of the utility's struggles to bolster its aging and vulnerable infrastructure against wildfires*, said Jennifer Potter, who lives in Lahaina and was a member of the Hawaii Public Utilities Commission until just nine months ago.

"*They were not as proactive as they should have been*," Potter said about Hawaiian Electric's fire-prevention planning, adding that there had not been any real meaningful action to "address some of those inadequacies in terms of wildfire."

*Doug McLeod, a former energy commissioner for Maui County, also said the utility was aware of the need for a regular shut-down system and to bury lines, especially given the "number of close calls in the past."*

*Earlier this week, high winds caused widespread damage to utility infrastructure. The intense gusts knocked down about 30 utility poles across the region, many onto trees and roads, complicating evacuations, according to Maui County Mayor Richard Bissen. He confirmed that some electrical lines were energized when they hit the ground*.

137. After this news became public, Hawaiian Electric's market capitalization plunged more than 54%, or $17.61 per share, closing at $14.79 per share on August 15, 2023, compared to the Company's August 11, 2023's closing

price of $32.40 per share, erasing $1.9 billion in market capitalization in just a few days.

138.   On August 16, 2023, the *WSJ* published an article titled "Hawaiian Electric Is in Talks with Restructuring Firms."   The article revealed that the S&P Global Ratings downgraded the Company's credit rating to junk and that Hawaiian Electric was speaking with advisory firms to address the Company's financial and legal challenges.   In particular, the article stated:

> ***Hawaiian Electric is speaking with firms that specialize in restructuring advisory work, exploring options to address the electric utility's financial and legal challenges arising from the Maui wildfires***, said people familiar with the matter.

> ***Hawaiian Electric is facing a selloff in its stock and bonds***, ***and has been hit with lawsuits alleging that its actions both before and during the wildfires exacerbated the devastation Maui residents have suffered***.

> The company is in discussions over the strategies it can pursue and to determine whether it needs to hire legal and financial advisers, the people said.

> On Thursday evening, a day after the publication of this report, a company spokesperson said: "Like any company in this situation would do, and as we do in the normal course of business, we are seeking advice from experts—the goal is not to restructure the company but to endure as a financially strong utility that Maui and this state need."

> ***More customer lawsuits are expected*** in coming weeks to increase the costs of defending and settling claims for Hawaiian Electric just as its access to financing is being threatened.

> ***S&P Global Ratings downgraded Hawaiian Electric's credit rating to junk on Tuesday, saying the wildfires destroyed a significant segment***

*of the company's customer base and will take many years to restore*.
S&P also said that wildfire lawsuits seeking compensation for injuries,
deaths and property damage will weigh on the company's credit quality.

139.   On August 17, 2023, the *WSJ* published another article titled,
"Hawaiian Electric Knew of Wildfire Threat, but Waited Years to Act."  The article
discussed how the Company had not learned from the 2019 wildfire season and
invested poorly in wildfire-specific projects from 2019 through 2022.  In particular,
the article stated:

> *During the 2019 wildfire season, one of the worst Maui had ever seen,
> Hawaiian Electric concluded that it needed to do far more to prevent
> its power lines from emitting sparks*.

> The utility examined California's plans to reduce fires ignited by power
> lines, started flying drones over its territory and vowed to take steps to
> protect its equipment and its customers from the threat of fire.

> Nearly four years later, the company has completed little such work.
> *Between 2019 and 2022, it invested less than $245,000 on wildfire-
> specific projects on the island, regulatory filings show*.  It didn't seek
> state approval to raise rates to pay for broad wildfire-safety
> improvements until 2022, and has yet to receive it.

> *Now, the company is facing scrutiny, litigation and a financial crisis
> over indications that its power lines might have played a role in
> igniting the deadliest U.S. wildfire in more than a century*. The blaze
> has caused at least 110 deaths, destroyed the historic town of Lahaina
> and resulted in an estimated billions of dollars in damage.

> *The fire's cause hasn't been determined, but mounting evidence
> suggests the utility's equipment was involved.  One video taken by a
> resident shows a downed power line igniting dry grass along a road
> near Lahaina. A firm that monitors grid sensors reported dozens of
> electrical disruptions in the hours before the fire began, including*

*one that coincided in time with video footage of a flash of light from power lines*.

Hawaiian Electric said it would investigate any role its infrastructure may have played and cooperate with a separate probe into the fire launched last week by the Hawaii attorney general.

"We all believe it's important to understand what happened.  And I think we all believe it's important to make sure it doesn't happen again," said Shelee Kimura, Hawaiian Electric's chief executive.

In response to questions about its wildfire-mitigation spending, a spokesman for Hawaiian Electric said the company reduces wildfire risk through its routine utility work, including trimming or removing trees and upgrading, replacing and inspecting equipment.  It said it has spent about $84 million on maintenance and tree work in Maui County since 2018.

The utility has long been a force in Hawaii politics and business.  In the wake of the fire, its finances are reeling.  Its stock has plunged 49% this week, and its credit rating was downgraded to junk by S&P.

*       *       *

At the end of 2019, Hawaiian Electric issued a press release about wildfire risk.  It said it would install heavier, insulated conductors on Maui and Oahu to minimize the risk of sparks when winds picked up, as well as technology to detect disruptions when the conductors came into contact with vegetation or each other. It said it would apply fire retardant on poles in risky areas and consider installing cameras and other devices to monitor weather conditions during fire season.

In filings over the next two years with the Hawaii Public Utilities Commission, which is tasked with approving utility projects and spending, the company made only passing reference to wildfire mitigation.

140.   Following the *WSJ* articles, the Company's market capitalization plunged more than 17%, or $2.54 per share, closing at $12.03 per share on August 17, 2023, erasing almost $279 million in market capitalization in just a single day.

141.   On September 24, 2033, the *WSJ* reported that "[a]s early as 2011, the company said it needed to move more quickly to upgrade its equipment or run the risk that failing poles would result in longer or more frequent blackouts.  It repeated the warnings in several subsequent filings."[31]  Moreover, HEI had "repeatedly told regulators the majority of its poles are built to a 1960s standard that didn't account for hurricane-strength winds.  Many are more than 40 years old, putting them at high risk of breaking down."[32]  HEI has repeatedly failed to make the upgrades it said it would, specifically: (i) in 2022, MECO was scheduled to spend at least $25 million to improve infrastructure on Maui, yet spent only $17 million and replaced fewer poles than anticipated; (ii) MECO designated $2.4 million in 2022 for a program on Maui to improve reliability, yet only spent $355,832; (iii) MECO stated it would spend $1.15 million in 2022 to better preserve its high- and low-voltage lines from starting fines, yet it spent less than $10,000 on the program.[33]

---

[31] Katherine Blunt & Dan Frosch, *Before Lahaina Burned, Hawaiian Electric Was Slow to Replace Poles that Posed Fire Risk*, Wall St. J. (Sept. 24, 2023), https://www.wsj.com/us-news/climateenvironment/maui-fire-hawaiian-electric-power-lines-1eaef7cf.

[32] *Id.*

[33] *Id.*

142.   On October 6, 2023, the *WSJ* published an article titled, "Hawaiian Electric's CEO Told Congress It Had a Wildfire Plan.   That Was News to Regulators."   During recent congressional hearings, defendant Kimura repeatedly referred to Hawaiian Electric's robust wildfire mitigation plan.  This "robust" plan, is only seventy-five pages, compared to the 1,000 or more pages contained in similar plans for California utilities that defendant Kimura stated served as guideposts.  In addition, the plan relied on untrustworthy websites for information, such as Wikipedia.  Certain analyses contained in the plan contradict widely accepted facts, such as the extent of flammable and invasive grasses throughout Maui.  The plan also was criticized by experts for not really addressing the risks Maui faced and for Hawaiian Electric failing to include key components of California's plans, such as emergency shutoffs.   Notably, Hawaiian Electric never provided the plan to the PUC.

## IX.   DAMAGES TO HAWAIIAN ELECTRIC

143.   Had the Individual Defendants maintained the Company's equipment and ensured that Hawaiian Electric had adequate safety protocols and procedures, the effects of the severe weather could have been mitigated.   Damage to the Company, Hawaiʻi, and 'Hawaiʻi residents' property could have been avoided or at least diminished.

144.   If the Individual Defendants took material risks to the Company seriously, such as maintaining a PSPS plan, the power lines would have been de-energized, and lives and property could have been saved.  The devastating wildfires ravaged Maui and the public, including potential investors, have put the blame squarely on Hawaiian Electric for the loss of life and billions of dollars in damages resulting from the Maui fires.  Hawaiian Electric's reputation has been extremely damaged because of the Individual Defendants' failure to oversee that the Company operated safely, and consistent with laws, rules, and industry standards.   The Company now has a target on its back to pay for the Individual Defendants' wrongdoing that has gained notoriety through national media coverage.

145.   The Company also faces potential damages related to government investigations into the cause of the fires.  The Attorney General of Hawai'i has opened an investigation into the Maui fires and has hired the Underwriters Laboratories Fire Safety Research Institute to assist with it.  The Oversight and Investigations Subcommittee of the U.S. House Committee on Energy and Commerce has held a hearing and issued requests for documents and information to HECO.

146.   On August 24, 2023, the County of Maui filed suit against HEI seeking damages for six causes of action, including negligence and gross negligence.  The County of Maui alleged that HEI ignored general, and specific, dangers of potential

wildfires on Maui, including high wind "Red Flag Warnings," and failed to have a PSPS plan or de-energize its power lines at critical times.

147.   Hawaiian Electric also faces an ever-growing host of tort lawsuits related to the wildfires for wrongful death, personal injury, and property loss or damage.   At least seventy tort lawsuits have alleged that Hawaiian Electric and Hawaiian Electric Company were negligent and committed a variety of torts by, among other things, failing to: (i) develop a PSPS plan; (ii) implement reasonable fire mitigation procedures; (iii) sufficiently fund fire mitigation measures; (iv) maintain aging infrastructure; (v) conduct adequate vegetation management; (vi) de-energize power lines on August 8, 2023, in response to Red Flag conditions; and (vii) support evacuation on August 8, 2023, due to road blockages from downed equipment.   Several lawsuits (a non-exhaustive list below) allege claims for wrongful death, negligence, gross negligence, strict liability, premises liability, trespass, private nuisance, public nuisance, intentional infliction of emotional distress, inverse condemnation, and ultrahazardous activity against the Company:

| Case Caption | Federal Court Case # | State Court Case # |
|---|---|---|
| In Re: Maui Fire Cases (Master Complaint) | 1:24-cv-00035 | 2CSP-23-0000057 |
| County of Maui vs. Maui Electric Company, et al. | | 2CCV-23-0000238 |
| Kohler v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00549 | 2CCV-23-0000243 |
| Westside Retail Investments, LLC v. Maui Electric Company | 1:23-cv-00573 | 1CCV-23-0001286 |
| Showcase Hawaii Productions, LLC, et al. v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00534 | 1CCV-23-0001045 |
| Loui v. Hawaiian Electric Industries, Inc. et al | | 2CCV-23-0000279 |
| Lahaina Waterfront LLC v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00516 | 2CCV-23-0000343 |

| | | |
|---|---|---|
| Burnes, et al. v. Hawaiian Electric Company, Inc., et al. | 1:23-cv-00452 | 2CCV-23-0000224 |
| Alvarez vs. Maui Electric Company, Limited, et al. | | 1CCV-23-0001215 |
| AmGUARD Ins Co et al vs. Maui Electric Co Ltd et al | | 1CCV-24-0000068 |
| Terrence Quinn et al. vs. HEI, Inc. | | 2CCV-24-0000046 |
| Sean Arnold, et.al vs. Maui Electric Company, et al | | 2CCV-24-0000036 |
| Certain Underwriters et al vs. Maui Electric et al | | 1CCV-24-0000179 |
| Maui Kai Enterprises LLC v. Maui Electric Company, Limited et al | 1:24-cv-00056 | 2CCV-23-0000416 |
| Curtis v. Maui Electric Company, Limited et al | 1:24-cv-00004 | 2CCV-23-0000409 |
| Carter v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00553 | |
| Malayan Jr. v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00597 | |
| Allen v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00591 | 2CCV-23-0000392 |
| Christian Altman, et al vs. HEI, Inc. | | 2CCV-23-0000419 |
| Kuskowski v. Maui Electric Company, Limited et al | 1:23-cv-00555 | 2CCV-23-0000366 |
| Manibog, et al. v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00530 | 2CCV-23-0000345 |
| Sharma v. Maui Electric Company, Limited et al | 1:23-cv-00529 | 2CCV-23-0000319 |
| Wells v. Maui Electric Company, Limited et al | 1:23-cv-00575 | 2CCV-23-0000251 |
| Virgin Capital, LLC v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00574 | 2CCV-23-0000311 |
| Rawlings v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00571 | 2CCV-23-0000367 |
| Randazzo v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00569 | 2CCV-23-0000371 |
| Russell v. Maui Electric Company, Limited et al | 1:23-cv-00568 | 2CCV-23-0000324 |
| Thomas v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00564 | 2CCV-23-0000230 |
| Tanabe v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00556 | 2CCV-23-0000235 |
| Ko v. Maui Electric Company, Limited et al | 1:23-cv-00546 | 2CCV-23-0000365 |
| Kinley v. Maui Electric Company, Limited et al | 1:23-cv-00543 | 2CCV-23-0000342 |
| Spreiter v. Maui Electric Company, Limited et al | 1:23-cv-00542 | 2CCV-23-0000310 |
| McIntire v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00541 | 2CCV-23-0000228 |
| Smith v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00538 | 2CCV-23-0000265 |
| Jose v. Maui Electric Company, Limited et al | 1:23-cv-00537 | 1CCV-23-0001114 |
| Jantoc v. Hawaiian Electric Industries, Inc. et al | 1:23-cv-00536 | 2CCV-23-0000237 |
| Harris, et al. v. Hawaiian Electric Industries, Inc., et al | 1:23-cv-00526 | 2CCV-23-0000322 |

148.   As a result of the Individual Defendants' wrongdoing, Hawaiian Electric's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt and dramatically reduced earnings because the improper statements disseminated by the Individual Defendants have materially increased the perceived

risks of investing in and lending money to the Company.  For example, S&P Global Ratings downgraded the Company's credit rating to "junk."

149.   The Individual Defendants also caused the Company to mislead the public regarding the Company's purportedly safe operations.  These improper statements have devastated Hawaiian Electric's credibility as reflected by the Company's almost $2 billion, or 55%, market capitalization loss and led to the Securities Class Action being filed.

150.   Further, as a direct and proximate result of the Individual Defendants' wrongdoing that led to more than 100 known deaths, Hawaiian Electric has expended, and will continue to expend, significant sums of money—the Company's liability is estimated to be a minimum of $3.8 billion.   Such expenditures include, but are not limited to:

a.   costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

b.   costs incurred from rating agencies slashing the Company's credit rating to junk status;

c.   costs to rebuild Hawaiian Electric's infrastructure on Maui;

d.   costs incurred from numerous government and tort actions related to the Maui fires; and

e.      costs incurred from compensation and benefits paid to the

defendants who have breached their duties to Hawaiian Electric.

## X.      DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

151.   Plaintiff brings this action derivatively in the right and for the benefit

of Hawaiian Electric to redress injuries suffered, and to be suffered, by Hawaiian

Electric as a direct result of breaches of fiduciary duty, waste of corporate assets,

and unjust enrichment, as well as the aiding and abetting thereof, by the Individual

Defendants.   Hawaiian Electric is named as a nominal defendant solely in a

derivative capacity.

152.   Plaintiff will adequately and fairly represent the interests of Hawaiian

Electric in enforcing and prosecuting its rights.

153.   Plaintiff was a shareholder of Hawaiian Electric at the time of the

wrongdoing complained of, has continuously been a shareholder since that time, and

is a current Hawaiian Electric shareholder.

**Exhaustion of Demand Requirement Under HRS § 414-173 of the Hawaiʻi Revised Statutes**

154.   HRS § 414-173 was amended in 2000 to mandate that a shareholder

may commence a derivative proceeding *only* after: "(1) A written demand has been

made upon the corporation to take suitable action; and (2) Ninety days have expired

from the date the demand was made unless the shareholder has earlier been notified

that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety-day period."

155.   Here, as demonstrated below, Plaintiff has alleged with particularity that: (i) he made a demand on the Board to take action; and (ii) it has been more than ninety days since the demand was made.  Additionally, the Board has wrongfully refused Plaintiff's demand.

**Plaintiff's Litigation Demand**

156.   On October 4, 2023, Plaintiff made a litigation demand (the "Litigation Demand") on the present Board as required by Hawaiian law, attached hereto as Exhibit 1.   Plaintiff demanded the Board to investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties.  Plaintiff urged the Board to commence these legal proceedings as expeditiously as possible, and to secure tolling agreements from all potential defendants.  Plaintiff also demanded that the Board reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Hawaiian Electric from committing future wrongful or wasteful acts.  Specifically, Plaintiff demanded that the Board: (i) strengthen the Board's oversight of Company operations; (ii) engage an external consultant to assess the Company's wildfire preparedness controls and plans and then provide revisions to the controls and plans; (iii) implement a PSPS plan; (iv)

assess the need for repairs to the Company's power lines and the need for burying certain power lines; (v) implement evidence retention protocols in connection with a wildfire; (vi) strengthen disclosure controls; (vii) establish a system for intake of complaints regarding serious maintenance issues or potential disaster preparedness problems for the Company; and (vii) permit shareholders to nominate at least three independent candidates for election to the Board.

157.   On October 6, 2023, Kurt K. Murao, Hawaiian Electric's Executive Vice President, General Counsel, Chief Administrative Officer, and Corporate Secretary, acknowledged receipt of the Litigation Demand and confirmed that the Litigation Demand was forwarded to each member of the Board.  Mr. Murao requested proof of Plaintiff's contemporaneous ownership of the Company's common stock from at least February 28, 2019 up through October 6, 2023.  Mr. Murao did not cite to any law requiring that Plaintiff send proof of contemporaneous ownership.

158.   On October 31, 2023, Plaintiff sent another letter to the Board asking if the Board has hired independent counsel to assist in considering the Litigation Demand.  Plaintiff's letter also made the Board aware that defendant Kimura was repeatedly referring to the Company's wildfire mitigation plan as "robust."  This "robust" plan, however, appears to be anything but and further supports the Litigation Demand's allegations that Hawaiian Electric's directors and officers

breached their fiduciary duties. The plan is only seventy-five pages, compared to the 1,000 or more pages contained in similar plans for California utilities that defendant Kimura stated served as guideposts. Further, the "robust" plan relied on untrustworthy websites for information, such as Wikipedia. Certain analysis contained in the plan was contradicted by widely accepted facts, such as the extent of flammable and invasive grasses throughout Maui. The plan also was criticized by experts for not really addressing the risks Maui faced and for Hawaiian Electric failing to include key components of California's plans, such as emergency PSPS plans. Notably, Hawaiian Electric never provided the plan to the PUC. Plaintiff further informed the Board that this information was limited to public information and that an investigation by the Board would not be limited in such a way. Plaintiff demanded that the Board also review the Company's internal documents and interview key employees, as well as all directors and officers. Although Mr. Murao's October 6, 2023 letter did not provide any legal requirement requiring Plaintiff to provide proof of ownership of Company stock, Plaintiff's counsel provided proof that Plaintiff is a Hawaiian Electric shareholder.

159. On November 17, 2023, counsel for the Board, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), sent a response to Plaintiff. WilmerHale stated that the Litigation Demand is being reviewed.

160.   On December 26, 2023, almost three months after the Litigation Demand was sent, defendants Fowler, Fargo, Connors, Flores, and Scilacci (the "Demand Directors") wrongfully refused the Litigation Demand (the "Wrongful Refusal") attached hereto as Exhibit 2.   Although the Demand Directors acknowledged that the Company faces a Securities Class Action, "more than 70 tort lawsuits,"[34] an ATF investigation, an investigation by the Attorney General of Hawaiʻi, and an Oversight and Investigations Subcommittee of the House Committee on Energy and Commerce investigation, the Demand Directors decided to not investigate any of the wrongdoing outlined in the Litigation Demand.

161.   The Wrongful Refusal stated that the Demand Directors were seeking tolling agreements with defendants Ajello, Connors, Dahl, Fargo, Flores, Fowler, Hazelton, Ito, Johns, Kāne, Kennedy, Kimura, Kipp, Lau, Otani, Pakkala, Russell, Scilacci, Sekimura, Seu, Taniguchi, and non-defendants Ann Teranishi and Kurt Murao.  However, the Demand Directors did not give a timeline of when the tolling agreements would be secured.   Further, there is a conflict of interest with the Demand Directors purportedly seeking tolling agreements with themselves. Moreover, the Demand Directors did not seek tolling agreements with defendants Watanabe, Powell, Zlotnicka, Taketa, and Burke.   This obvious tactic only

---

[34] Wrongful Refusal at 2.

exacerbates the need for the Board to investigate the wrongdoing described in the demand and establishes that the Board has not made ***any*** effort to identify the wrongdoers.

162.   Lastly, the Wrongful Refusal did not identify any actions by the Board to reform or improve the Company's corporate governance and internal procedures. Specifically, the Wrongful Refusal failed to address the Company's inadequate cut-and-paste seventy-five-page wildfire mitigation plan.

163.   On March 20, 2024, approximately five and a-half months after Plaintiff sent the Litigation Demand, the Demand Directors sent Plaintiff a letter in further response to the Litigation Demand.  According to this letter, the Company had still secured tolling agreements despite three months passing since the Wrongful Refusal.  The March 2024 Wrongful Refusal still did not identify any actions by the Board to reform and improve the Company's corporate governance and internal procedures.  Accordingly, the Company remains exposed to additional harm from the wrongful conduct described herein and is not protected against the running of the statute of limitations why the Board failed to consider Plaintiff's demand.

## XI.    COUNTS

### COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty**

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    The Individual Defendants owed and owe Hawaiian Electric fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Hawaiian Electric the highest obligation of care and loyalty.

166.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

167.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) that the Company's risk mitigations, adherence to ESG principles, and emergency planning were inadequate; (ii) that statements concerning the Company's risk mitigations, adherence to ESG principles, and emergency planning were materially false and misleading; and (iii) that the Company's procedures and actions of moving evidence interfered with an ATF investigation. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

168.   The Director Defendants, as directors of the Company, owed Hawaiian Electric the highest duty of loyalty.  These defendants breached their duty of loyalty by knowingly and recklessly permitting the improper activity concerning the Company's risk mitigations, adherence to ESG principles, and emergency planning. The Director Defendants knew or were reckless in not knowing that: (i) that the Company's risk mitigations, adherence to ESG principles, and emergency planning were inadequate; (ii) that statements concerning the Company's risk mitigations, adherence to ESG principles, and emergency planning were materially false and misleading; and (iii) that the Company's actions of moving evidence interfered with an ATF investigation.  Accordingly, these defendants breached their duty of loyalty to the Company.

169.   The Audit and Risk Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit and Risk Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit and Risk Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit and Risk Committee Charter in effect at the time.

170.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hawaiian Electric has sustained significant damages,

as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

171.   Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Waste of Corporate Assets**

172.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.   As a result of the Company's (i) inadequate risk mitigations, adherence to ESG principles, and emergency planning; (ii) materially false and misleading statements concerning the Company's risk mitigations, adherence to ESG principles, and emergency planning; and (iii) the actions of moving evidence which interfered with an ATF investigation, the Individual Defendants have caused Hawaiian Electric to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

174.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

175.   Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

176.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Hawaiian Electric.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Hawaiian Electric.

178.   Plaintiff, as a shareholder and representative of Hawaiian Electric, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

179.   Plaintiff, on behalf of Hawaiian Electric, has no adequate remedy at law.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Hawaiian Electric, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches

of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Hawaiian Electric to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hawaiian Electric and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over risk assessment, management, and mitigation, specifically those posed by severe weather events;

2.    a proposal to strengthen Hawaiian Electric's oversight of its disclosure procedures;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.    a provision to permit the shareholders of Hawaiian Electric to nominate at least three candidates for election to the Board;

C.    Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching,

impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Hawaiian Electric has an effective remedy;

D.    Awarding to Hawaiian Electric restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## XIII. JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

DATED: Honolulu, Hawaiʻi, April 8, 2024.

**LOCAL COUNSEL**

*/S/ Carl M. Varady*
Carl M. Varady (HI Bar No. 4873)
Pauahi Tower
1003 Bishop Street, Suite 1730
Honolulu, Hawaiʻi 96813
Telephone: 808-523-8447
E-mail: carl@varadylaw.com

ROBBINS LLP
*Pro Hac Vice Pending*
Brian J. Robbins
Gregory E. Del Gaizo
Ashley R. Rifkin
Jacob W. Ogbozo
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:  brobbins@robbinsllp.com
         gdelgaizo@robbinsllp.com
         arifkin@robbinsllp.com
         jogbozo@robbinsllp.com

ROBBINS GELLER RUDMAN &
DOWD LLP
*Pro Hac Vice Pending*
Darren J. Robbins
Travis E. Downs III
Randall J. Baron
Benny C. Goodman III
655 W. Broadway, Suite 1900
San Diego, CA 2101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
E-mail:  darrenr@rgrdlaw.com
         travisd@rrgrdlaw.com
         randyb@rgrdlaw.com
         bennyg@rgrdlaw.com

RM LAW, P.C.
*Pro Hac Vice Pending*
Richard A. Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
E-mail: rmaniskas@rmclasslaw.com

1651190

- 90 -