IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| IN RE HAWAIIAN ELECTRIC INDUSTRIES, INC., STOCKHOLDER DERIVATIVE LITIGATION | Lead Case No. 24-cv-00164 MWJS-WRP<br>*Consolidated with*<br>Case No. 24-cv-00247 MWJS-WRP<br>*This Document Relates to All Actions*<br><br>OPINION AND ORDER APPROVING DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL WITH PREJUDICE |

### INTRODUCTION

On August 8, 2023, fires ravaged the island of Maui.  They tore through Olinda, through Kula, and, most devastatingly, through the town of Lahaina.  The flames destroyed thousands of homes and claimed over a hundred lives.  It was the deadliest wildfire in the United States in over a century.

Hundreds of lawsuits followed, many of them faulting the local utility company, Hawaiian Electric Industries, Inc. (HEI).  This consolidated derivative action also followed, in which HEI shareholders sought to hold certain HEI directors and officers liable for allegedly exposing HEI to staggering amounts of liability in the other pending lawsuits.  Similar derivative actions were brought in federal court in California and state court in Hawaiʻi.

After months of arms-length negotiations aided by an experienced neutral mediator, the parties reached a settlement.  By its terms, Hawaiian Electric Company, Inc. (HECO) and its parent company, Hawaiian Electric Industries, Inc. (HEI) would receive $100 million in cash for the settlement of the derivative actions.  The parties represent that this contemplated $100 million award—to be funded by the insurance carriers of the defendants in these actions—would constitute the largest cash recovery from a shareholder derivative settlement in the history of the State of Hawai'i.  Dkt. No. 104-1, at PageID.2081.  They further represent that it would rank "among the top monetary recoveries ever achieved in a derivative settlement nationwide." *Id.*

Plaintiffs in this case, George Assad and Robert Faris, now move for this court's final approval of the settlement and entry of judgment.  Dkt. No. 104.  They also seek this court's approval of proposed attorney's fees, costs, and awards.  *Id.*  They note that HEI's shareholders were provided court-authorized notice of the proposed settlement, and none filed any objections as of the date of the filing of their motion.  Dkt. No. 104-2, at PageID.2119.  They further note that Defendants do not oppose the motion or any of its requested relief.  Dkt. No. 104-1, at PageID.2081.

Having carefully considered the written submissions, as well as oral argument from counsel, the court is satisfied that the settlement is fair.  The court also concludes that the stipulated attorney's fees, costs, and awards are appropriate.  Accordingly, the

court enters the Final Approval Order appended to the end of this opinion and directs the Clerk of Court to enter final judgment forthwith.

## BACKGROUND

### A.    The Derivative Actions

HEI is a publicly traded corporation that, through its subsidiary electric utility companies—including HECO—supplies power to ninety-five percent of Hawaiʻi residents.  Plaintiffs George Assad and Robert Faris allege that they are shareholders of HEI, and in that capacity, each filed a shareholder derivative suit in the District of Hawaiʻi.  *See Assad v. Seu*, 24-cv-164 (D. Haw.); *Faris v. Seu*, 24-cv-247 (D. Haw.).  In their respective actions, Assad and Faris sued the same twenty-six defendants, all of whom are current or former officers of HEI or directors on its board (the "Individual Defendants"), plus HEI itself as a nominal defendant.  On July 3, 2024, the cases were consolidated into this single derivative action.  *See* Dkt. No. 74.

In their consolidated derivative action, Plaintiffs fault certain HEI directors and officers for causing and exacerbating the Maui fires.  For years, Plaintiffs allege, these directors and officers knew about the risk of severe weather events, knew that HEI's equipment was inadequately maintained, and knew that the company's safety protocols were insufficient. Dkt. No. 1, at PageID.3 (Compl. ¶ 3).  Not only did they allegedly fail to mitigate these risks, but they allegedly downplayed the risks, too, by making false statements that misled government agencies, HEI shareholders, and the public.  *See id.*

3

Plaintiffs say these failures directly contributed to the devastation on August 8, 2023.  According to news stories, in the days preceding the fires, weather services had warned of powerful winds that could create fire conditions.  *Id*. at PageID.67 (¶ 136).  While HEI "was aware that a power shut-off was an effective [mitigation] strategy," it failed to take that approach.  *Id*. at PageID.68 (¶ 136) (quoting Brianna Sacks, *Hawaii Utility Faces Scrutiny for Not Cutting Power to Reduce Fire Risks*, WASH. POST (Aug. 12, 2023)).  So on August 8, strong winds knocked down energized utility poles.  *Id*.  Those downed lines, media outlets reported, ignited the surrounding brush, causing the fires that decimated Lahaina and took over a hundred lives.  *Id*. at PageID.67 (¶ 136).  Plaintiffs allege that the fires—and the subsequent critical news coverage—sunk HEI's stock price.  In a matter of days, the price fell by more than half, erasing around $2 billion of HEI's market capitalization.  *Id*. at PageID.5 (¶ 7).

All told, Plaintiffs estimate that the Individual Defendants' wrongdoing will cost HEI upwards of $3.8 billion from settlements, litigation expenses, infrastructure investment, compensation to the Individual Defendants, and a credit downgrade.  *Id*. at PageID.77-78 (¶ 150); *see also* Dkt. No. 1, at PageID.5 (Compl. ¶ 10), *Faris v. Seu*, 24-cv-247 (D. Haw. June 8, 2024) ("HEI is embroiled in numerous lawsuits, subjecting the Company to potential liabilities of approximately $4.9 billion . . . .").[1]  Aiming to recover

---

[1]    The hundreds of tort lawsuits filed after the wildfire were "recently resolved through a $4 billion global settlement," of which HEI is "reported to be responsible for approximately $1.99 billion."  Dkt. No. 91-3, at PageID.1797.

4

from the Individual Defendants for the benefit of HEI, Plaintiffs press claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Dkt. No. 1, at PageID.84-87 (¶¶ 164-79). They ask for damages—which would go to the company— and reforms to HEI's corporate governance. *Id*. at PageID.87-89.

Defendants generally deny these allegations and maintain they should not be held liable. And HEI argued that the derivative action should be stayed pending resolution of the other wildfire-related cases. Dkt. No. 31. This court agreed. *In re Hawaiian Elec. Indus., Inc., S'holder Derivative Litig.*, No. 24-cv-00164, 2024 WL 3594783 (D. Haw. July 30, 2024).

Meanwhile, other shareholders brought derivative actions in Hawai'i state court, which were consolidated there. *In re Hawaiian Elec. Indus. Inc. & Hawaiian Elec. Co., Inc. State Court Derivative Litig.*, No. 1CCV-23-0001181 (Haw. Cir. Ct.). Shareholder actions brought in the Northern District of California were similarly consolidated. *See In re Hawaiian Elec. Indus., Inc. & Hawaiian Elec. Co., Inc., Derivative Litig.*, Case No. 3:23-cv-06627 (N.D. Cal.). Although the state court action remains pending, the plaintiffs in the California federal action secured its dismissal without prejudice, which they represent was meant to "streamline this litigation and conserve resources." Dkt. No. 91-3, at PageID.1795.

//

//

5

B.      The Settlement Negotiations

As explained in a joint declaration from co-lead counsel for Plaintiffs, the parties "engaged in arm's-length negotiations over several months with the assistance of a highly experienced and respected mediator."  Dkt. No. 104-2, at PageID.2109.

That the mediator involved, David M. Murphy, is "highly experienced" cannot be questioned.  As he explains in his own declaration, he is a "full-time professional mediator, arbitrator, and independent panelist with Phillips ADR Enterprises, P.C.," an alternative resolution firm founded by the Honorable Layn R. Phillips, a former United States Attorney and retired United States District Judge.  Dkt. No. 104-3, at PageID.2142. Since joining the firm in 2017, Murphy has "served as a mediator, arbitrator, or independent monitor in hundreds of commercial cases, including antitrust, patent, securities law, corporate governance, investment company, bankruptcy, environmental, contract, and tort cases."  *Id.* at PageID.2143.  And he has "successfully mediated resolutions in hundreds of stockholder derivative and securities actions pending in jurisdictions throughout the United States."  *Id.*  Before joining Phillips, Murphy was a senior litigation partner at one of the most highly regarded law firms in the United States, Wachtell, Lipton, Rosen & Katz, where he practiced law for nearly three decades. And he clerked for Judge Ralph K. Winter, Jr., of the United States Court of Appeals for the Second Circuit and Chief Judge Charles L. Brieant of the United States District Court

6

for the Southern District of New York—two courts (and judges) well known for their preeminence in the areas of corporate law and litigation.

Nor can it be questioned that Murphy was extensively involved in the mediation process in this case.  As he explains, he was "jointly retained" by the parties to preside over the settlement discussions and negotiations.  *Id*.  In that role, he "reviewed detailed mediation statements and reply briefs and related exhibits provided by" the parties, which helped him to "develop a thorough understanding of the risks, obstacles, and challenges facing each of the" parties.  *Id*.  He presided over "two formal, all-day mediation sessions," first on January 22, 2025, and then on July 14, 2025.  *Id.* at PageID.2144.  The sessions were attended by Plaintiffs' counsel, outside counsel for HEI and certain Individual Defendants, outside counsel for HECO, and representatives and counsel for the relevant insurers.  *Id.*  Murphy held "substantive and productive" discussions with the parties and relevant insurers "in a number of joint and separate caucus sessions."  *Id.*  Although no settlement was then reached, Murphy "facilitated and supervised" additional mediation efforts over the following months.  *Id.*  He attests that "the negotiations were adversarial and conducted at arm's-length."  *Id.*  The end result was an executed formal term sheet on November 5, 2025.  *Id.*  The terms of that agreement, in Murphy's view, are "a fair and reasonable compromise for the benefit of HEI."  *Id.* at PageID.2145.

HEI's board, "including all of the independent directors," share Murphy's view: they "approved . . . the Settlement and each of its terms" as "fair, reasonable, and in the best interests of HEI and its shareholders."  Dkt. No. 104-1, at PageID.2083 (quoting Dkt. No. 91-3, at PageID.1798, 1812-13 (Stip., §§I.H., III., ¶2.3)).

### C.      The Settlement Terms

The terms of the settlement were reduced to a written settlement agreement and stipulation, Dkt. No. 91-3, at PageID.1788-1838, which was executed on December 31, 2025.  The settlement contains two key provisions:  (1) a cash payment to HEI, and (2) dismissals and releases.

*Cash Payment to HEI.*  Defendants agree to cause their insurers to pay $100 million for the benefit of HEI, pursuant to the terms of an escrow agreement.  Dkt. No. 91-3, at PageID.1892–1932.  This settlement fund will be used to cover any expenses (for example, the costs of managing the escrow account) as well as to pay out any attorney's fees and other like expenses authorized by the court.  A part of the fund—$1 million— will be released to HEI so that it can pay an anticipated initial installment of a proposed settlement in a pending California federal securities action that has been filed against HEI.  *Bhangal v. Hawaiian Elec. Indus., Inc.*, No. 3:23-cv-04332 (N.D. Cal.).[2]  The balance will be released to HEI "for its exclusive benefit."  Dkt. No. 91-3, at PageID.1861.

---

[2]      The reader might benefit from a clarification:  this federal securities action is different from the California federal derivative action that was voluntarily dismissed

***Dismissals and Releases.***  If the settlement is approved, the derivative action will be dismissed with prejudice, and several identified Defendants will be released from specifically identified claims (which the settlement agreement calls the "Released Claims").  *Id.* at PageID.1862.  Likewise, HEI, HECO, and Defendants agree to release Plaintiffs from any claims that arise out of or relate in any way to the "institution, prosecution, or settlement" of these claims, save for claims related to the enforcement of this settlement.  *Id.* at PageID.1863.

Four other provisions of the settlement are worth highlighting:

First, the effective date of the settlement is the first date on which each of the following conditions have occurred:  the escrow account is timely funded; HEI and HECO's boards (including non-defendant independent members) have approved the settlement; the court has entered a Final Approval Order and Judgment; and the entry of final judgments in this federal action and the Hawai'i state derivative action, in which the actions are dismissed with prejudice.[3]  *Id.* at PageID.1822-23.

---

without prejudice.  Whereas the plaintiffs in the dismissed California federal derivative action are parties to the settlement agreement here (and the settlement here will resolve their claims), the plaintiffs in the federal securities action are not.  The settlement of this derivative action is not contingent on approval of the proposed settlement in that federal securities action, and this court has no occasion to address whether the settlement in that action is appropriate or should be approved.

[3]     The settlement provides that if either this court or the Hawai'i state court does not approve the settlement, then the settlement "shall be deemed null and void" unless the parties agree to "proceed with an alternative or modified stipulation of settlement and submit it for Court approval."  Dkt. No. 91-3, at PageID.1823.

Second, the settlement contemplates that after its execution, the parties will submit it to the court and move for preliminary approval of the settlement. After receiving preliminary approval, the parties agreed to provide two forms of notice to HEI's shareholders, at HEI's expense, of the settlement, its terms, and its reasons. Dkt. No. 91-3, at PageID.1818; *see also id.* at PageID.1849-1872 (Long-Form Notice) and PageID.1874-79 (Short-Form Notice).

Third, the settlement includes a stipulation that this court "shall retain jurisdiction with respect to implementation and enforcement of the terms of this Stipulation, the Final Approval Order, and the Judgment," and the settling parties and their counsel "submit to the jurisdiction of the Court for purposes of implementing and enforcing" those documents. *Id.* at PageID.1830. This provision is meant to ensure that in the event of a disagreement over the terms of the settlement agreement, the parties can return to federal court for a ruling. *See generally Palekaiko Beachboys Club, Inc. v. City & Cnty. of Honolulu*, Civ. No. 25-00304, 2026 WL 18748, at *10 (D. Haw. Jan. 2, 2026) (explaining that "ancillary jurisdiction to enforce a settlement agreement exists only if the court either (1) incorporates the terms of the settlement agreement into an order, or (2) expressly retains jurisdiction to enforce it").

Finally, although it is not a condition of approval of the settlement, the parties agree that Plaintiffs' counsel intend to request court approval of attorneys' fees equal to 25 percent of the settlement amount plus expenses not to exceed $475,000. Dkt. No. 91-

3, at PageID.1821; *see also id.* at PageID.1822 ("Any objection, appeal, or dispute relating to or regarding the Fee and Expense Amount shall not be cause to terminate or delay implementation of this Settlement[.]").  Plaintiffs' counsel will then allocate the fee and expense award among themselves, and in the event of any disagreement, shall submit to the binding, non-appealable resolution of a mediator.  *Id.* at PageID.1821-22.

### D.      Settlement-Related Procedural History

As contemplated by the settlement agreement, on January 2, 2026, Plaintiffs filed an unopposed motion for preliminary approval of the settlement.  Dkt. No. 91.  The court initially scheduled a hearing on the motion for February 10, 2026, Dkt. No. 96, but later continued the hearing to March 9, 2026, Dkt. No. 97.  Following the hearing, the court made two findings.  First, it found that the proposed settlement "falls 'within the range of possible approval' as 'fair, reasonable, and adequate.'"  Dkt. No. 100, at PageID.1992 (quoting *In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 517 (N.D. Cal. 2020) (further citation omitted)).  Second, it found that the proposed long-form and short-form notices to shareholders are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Id.* (quoting *Lloyd v. Gupta*, No. 15-cv-04183, 2016 WL 3951652, at *6 (C.D. Cal. July 22, 2016), in turn quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

Based on these findings, the court accepted Plaintiffs' Proposed Order Preliminarily Approving Derivative Settlement and Providing for Notice, Dkt. No. 91-3, at PageID.1840-79 (Ex. A), and separately filed that order on the court's docket, Dkt. No. 101.

A final approval hearing was scheduled for May 28, 2026. Dkt. No. 100, at PageID.1992. In advance of that hearing, the parties issued the long-form and short-form notices to shareholders, as authorized and ordered by the court. No shareholders filed any objections to the settlement. Dkt. No. 104-2, at PageID.2119. Furthermore, the settlement has received the required board approval. *Id*. All that is left, therefore, is for this court (and the Hawai'i state court) to enter an approval order and judgment, after which the escrow account will be funded and the settlement will take full effect. The court now turns to Plaintiffs' unopposed motion requesting this court's final approval.

## DISCUSSION

### A. The Settlement Is Fair, Reasonable, and Adequate

Parties in civil litigation settle their cases all the time—and often without any approval of a court. But derivative actions are not the typical lawsuit. They are brought, not to enforce a plaintiff's own rights, but to "enforce a right that the corporation 'may properly assert but has failed to enforce.'" *In re Hawaiian Elec. Indus., Inc., S'holder Derivative Litig.*, 2024 WL 3594783, at *3 (quoting Fed. R. Civ. P. 23.1(a)). "Because a derivative action is brought for the benefit of a corporation, it must

12

represent the best interests of the corporation." *Id.*  And, it logically follows, a resolution of that lawsuit should likewise be in the best interests of the corporation— not merely in the best interests of the shareholders who brought the action.

Recognizing that derivate actions are distinctive in these ways, the Federal Rules of Civil Procedure treats their resolution differently:  Rule 23.1(c) provides that a "derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23.1(c).  And, before any approval can be granted, "[n]otice of a proposed settlement . . . must be given to shareholders or members in the manner that the court orders."  *Id.*

The parties here did provide notice just as this court ordered them to do.  The only remaining issue is whether the settlement should now meet with this court's approval.

There is a "'strong judicial policy' in favor of settlement in complex cases."  *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 716 F. App'x 603, 605 (9th Cir. 2017) (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377-78 (9th Cir. 1995)).  That policy is especially strong in derivative actions, because "they are expensive and rarely successful at trial."  *Aarona v. Unity House Inc.*, No. CV 05-00197, 2008 WL 2547356, at *2 (D. Haw. June 25, 2008) (cleaned up).  That policy must guide a court's assessment of whether a proposed settlement is "fundamentally fair, adequate, and reasonable."  *Pac. Enters.*, 47 F.3d at 377 (cleaned up).

13

Courts also have identified a number of factors that may guide a court's assessment, including "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; . . . the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of [shareholders] to the proposed settlement." *Officers for Just. v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). But ultimately, a hearing on the fairness of a settlement "is not to be turned into a trial or rehearsal for trial on the merits." *Id.* The question is not so much whether the court suspects that plaintiffs might have done better if they had chosen to litigate a case to its bitter end, but rather whether the agreement reached is a reasonable one that properly accounts for the risks of litigation and treats all interested parties fairly.

With these considerations in mind, the court considers each of the factors listed above.

### 1.      The Amount Offered in Settlement

As noted, the amount offered in settlement is one of the factors commonly considered. Indeed, as Plaintiffs correctly observe, the "benefit to the company on whose behalf the derivative suit was brought," Dkt. No. 104-1, at PageID.2087, can sometimes be the "principal factor to consider," *id.* (quoting *Bell ex rel. Eco Science Sols., Inc.*, Civ. No. 17-00530, 2020 WL 8768633, at *1 (D. Haw. Nov. 17, 2020)).

14

That factor weighs in favor of the reasonableness of the settlement here. Plaintiffs represent—and the record reveals no reason to doubt—that the $100 million cash payment here is "the largest derivative settlement in Hawai'i history and ranks as the third largest payment to a company resulting from a derivative settlement within the Ninth Circuit." Dkt. No. 104-1, at PageID.2088. And Plaintiffs further represent that, to their knowledge, there has never before been a settlement of this size in any derivative action in a "universal demand state" like Hawai'i—that is, a state that requires shareholders to make a demand upon the company before bringing a derivative action, a requirement that can create potentially insurmountable procedural hurdles to bringing such a lawsuit. *Id.*

To be sure, the wildfire on Maui produced extraordinary harms that are, painfully, equally unparalleled in the last century of this country's history. The alleged misconduct of the Individual Defendants here, therefore, exposed HEI and HECO to staggering amounts of liability. One would expect a settlement of this kind of potential liability to command a proportionally substantial number.

Put differently, it is not so much the absolute amount of the settlement, but rather its size in relation to HEI's potential exposure, that matters the most. And it is unclear, at least on this record, whether the relationship between the potential exposure to HEI and the settlement figure proposed here exceeds or even matches what is common in other derivative actions.

15

Nonetheless, the sheer absolute size of proposed settlement payment does tend to support the impression that the settlement is fair.  One measure is HEI's own company income:  "$100 million is equal to more than 81% of the Company's 2025 reported net income."  Dkt. No. 104-1, at PageID.2087.  Granted, that striking statistic is not a comparison of HEI's potential liability to the proposed settlement amount, but it does tend to support the view that the settlement amount is quite large.

And even if the relative size of the settlement amount to the potential liability is unclear on this record, the substantial risks of further litigation in a case of this kind (which we have touched on in mentioning that Hawai'i is a universal demand state, and which we will discuss in more detail below) support the conclusion that full-blown litigation could well have resulted in no monetary award for HEI at all.  The record-setting award the parties have negotiated is, of course, extremely substantial in comparison to the possibility of HEI receiving nothing.

For these reasons, the amount offered in settlement weighs in favor of finding that the settlement is fair, reasonable, and adequate.

### 2.    The Reaction of Shareholders

Although the amount of the settlement does not, standing alone, conclusively show that the settlement is reasonable, other features of the record begin to tip matters decisively in the settlement's favor.  The first of these is the reaction of shareholders.

Following the court's preliminary approval of the settlement on March 9, 2026, the parties provided HEI shareholders with notice of the terms of the settlement and information about how to lodge objections to it. Dkt. No. 101-1, at PageID.2020-22; Dkt. No. 101-2, at PageID.2027-29. No shareholders made any objections. The absence of any shareholder opposition "weighs in favor of finding that the settlement is fair, reasonable, and adequate." *Bell ex rel. Eco Science Sols.*, 2020 WL 8768633, at *2; *see also Chenoy v. Lyft, Inc.*, No. 20-cv-09257, 2025 WL 948065, at *4 (N.D. Cal. Mar. 28, 2025) (explaining that the absence of shareholder opposition, after proper notice and an opportunity to file objections, raises a presumption that the settlement is fair).

### 3. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

Also weighing in favor of the settlement is the risk, expense, complexity, and likely duration of further litigation if no settlement had been reached.

The risk of further litigation is high for all sides. For the Individual Defendants, the potential liability here could have been extremely large—it could have far exceeded the terms of their insurance coverage. For HEI, too—the party on whose behalf Plaintiffs litigate—the risks are substantial. As Plaintiffs rightly note, "derivative lawsuits are rarely successful," Dkt. No. 104-1, at PageID.2089, and "the odds of winning" one "extremely small," *id.* (quoting *Pac. Enters.*, 47 F.3d at 378). *See also In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110, 2008 WL 5382544, at *2 (N.D. Cal.

17

Dec. 22, 2008) (observing that "shareholder derivative actions are notoriously difficult and unpredictable" (cleaned up)).

That is especially true in a universal demand state like Hawaiʻi; as Plaintiffs note, to "survive Defendants' threshold pleading challenges, Plaintiffs would have to adequately allege their litigation demands on HEI's Board were wrongfully refused," which is an "arduous hurdle." Dkt. No. 104-1, at PageID.2089. There is a dearth of Hawaiʻi state court precedent on the question of whether a board's refusal is wrongful, which rendered "a favorable outcome even more uncertain and increas[ed] the likelihood of prolonged appeals, but of which could leave the Company with no recovery after years of costly litigation." *Id.* at PageID.2090. And even if Plaintiffs had been able to clear that hurdle, they also faced the possibility of HEI's Board "elect[ing] to appoint an independent special litigation committee . . . to investigate the claims and determine whether continued prosecution of those claims would be in the Company's best interests." *Id.* Overcoming a Board decision to terminate the litigation—which arguably is entitled to substantial deference under the business judgment rule—"would entail more delay, expense, and uncertainty." *Id.* At the end of full-blown litigation, then, HEI could well have ended up receiving less than the settlement amount, or possibly even nothing.

The expense, complexity, and likely duration of further litigation also strongly weigh in favor of the settlement. Continued litigation would undoubtedly have been

"extremely complex, costly, and of substantial duration."  *Id.* at PageID.2091.  It would have required "extensive discovery and the preparation and defense of expert reports." *Id.*  Summary judgment and possibly a trial would have followed, and each stage would have compounded the costs, the complexity, and the delay.  Post-trial motions and appeals would likely have followed any verdict, further adding to the costs and uncertainties.  And because a larger judgment would likely have depleted Defendants' insurance, there is a serious question whether any such larger judgment would have been fully recoverable.  *Id.* at PageID.2092.

For all of these reasons, the risk, expense, complexity, and likely duration of further litigation weigh in favor of finding that the settlement is fair, reasonable, and adequate.  Indeed, these factors weigh heavily in favor of that finding.

### 4. The Strength of Plaintiffs' Case

Another relevant factor is the strength of Plaintiffs' case.  If a plaintiff has an open-and-shut case, for example, it is less likely that a settlement at a sharp discount is fair, reasonable, and adequate.  At the other extreme, if a plaintiff faces an imposing road to recovery, even a modest settlement can prove to be appropriate on behalf of a company.

For some of the reasons discussed above, Plaintiffs' case is closer to the latter end of the spectrum.  They faced considerable challenges in this lawsuit, and it is far from certain that full-blown litigation would have resulted in any recovery, let alone a

recovery of the nature they negotiated for here.  And, what is more, at least one of

Plaintiffs' key theories of liability is a challenging one to advance:  as they recognize, a

claim that directors and officers failed to provide proper oversight is "possibly the most

difficult theory in corporation law upon which a plaintiff might hope to win a

judgment."  Dkt. No. 104-1, at PageID.2091 (quoting *In re Caremark Int'l Inc. Derivative*

*Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).

The strength of Plaintiffs' case—or, perhaps more precisely, the challenges

Plaintiffs would have faced had they chosen to litigate this case to a full conclusion—

weighs in favor of the fairness, reasonableness, and adequacy of the settlement.

### 5.      The Experience and Views of Counsel

The court next considers the experience and views of counsel.  All parties here

were represented by experienced counsel, all of whom believe the settlement is fair.  *Id.*

at PageID.2093.  That counts in favor of finding the settlement fair, reasonable, and

adequate.

Two features of the record are especially important in this derivative action.  The

first is that HEI's Board—including, importantly, its independent directors—has

concluded that the settlement is "fair, reasonable, and in the best interests of HEI and its

shareholders."  Dkt. No. 104-1, at PageID.2083 (quoting Dkt. No. 91-3, at PageID.1798,

1812-13 (Stip., §§ I.H., III., ¶2.3)).  The views of HEI's independent directors weigh

20

heavily in favor of approving the settlement, given that this is a derivative action brought on behalf of HEI.

The second is that the settlement is the product of arm's-length and adversarial negotiations, which not only were conducted by experienced counsel, but also were facilitated and supervised by a neutral and highly experienced mediator. Although there was no governmental participant in these negotiations, the mediator in this case, David M. Murphy, was jointly retained by both sides (ensuring his neutrality), and was extensively involved in the mediation efforts over the course of multiple months and through two formal full-day mediation sessions. At the end of these substantial efforts, Murphy has concluded that the settlement "is a fair and reasonable compromise for the benefit of HEI." Dkt. No. 104-3, at PageID.2145. Murphy's views, under these circumstances, provide strong support for the fairness, reasonableness, and adequacy of the settlement.

### 6. The Stage of the Proceedings

That leaves the factor that considers the extent of discovery completed and the stage of the proceedings. As noted, this court stayed the derivative action in July 2024, with the consequence that no significant formal discovery practice or other proceedings have taken place in this case. But Plaintiffs are correct that "formal discovery is not a necessary ticket to the bargaining table," Dkt. No. 104-1, at PageID.2095 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)), and the key question is

21

instead whether the parties have done enough work on this litigation—whether through formal discovery or otherwise—to have developed a solid basis for making reasonably informed judgments about settlement. *See Mego Fin. Corp.*, 213 F.3d at 459 (upholding district court's "conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement," even though "extensive formal discovery had not been completed").

Although the case has been stayed, Plaintiffs represent that they engaged in extensive factual and legal work, including a substantial pre-filing investigation. Dkt. No. 104-1, at PageID.2095-96. It is also significant that, as noted, a neutral mediator played a substantial role in discussing settlement with the parties, which included helping the parties confront and properly evaluate the risks each side faced. These circumstances make up some of the ground that is lost because of the lack of meaningful formal discovery practice in this case.

In the end, the court concludes that the stage-of-proceedings factor does not weigh in favor of the fairness, reasonableness, and adequacy of the settlement. But given that all other factors do, the court finds that the settlement is indeed fair, reasonable, and adequate.

## B.      The Award of Attorneys' Fees and Expenses

Separately from the settlement itself, the parties negotiated and agreed upon attorneys' fees in the amount of $25 million, reasonable litigation expenses in the

22

amount of $168,624.99, and service awards of $5,000 for each Plaintiff, all to be paid

from the $100 million settlement fund.  *Id.* at PageID.2096, 2103.  Plaintiffs now seek this

court's approval of the agreed-upon fees and expenses.

### 1.    The Requested Attorneys' Fees Are Reasonable

There are two ways to assess the reasonableness of a request for attorneys' fees.

The most common is the traditional "lodestar" calculation.  *See Hensley v. Eckerhart*, 461

U.S. 424, 433 (1983); *see also Shea v. Kahuku Hous. Found., Inc.*, Civ. No. 09-00480, 2011 WL

1261150, at *5-8 (D. Haw. Mar. 31, 2011) (applying the lodestar method).  Under this

method, the court "must determine a reasonable fee by multiplying 'the number of

hours reasonably expended on the litigation' by 'a reasonable hourly rate,'" and then

the court should consider "whether to adjust the lodestar amount" based on an

evaluation of additional considerations, such as "the time and labor required," the

"novelty and difficulty of the questions involved," and "whether the fee is fixed or

contingent."  *Shea*, 2011 WL 1261150, at *5 (quoting *Hensley*, 461 U.S. at 433, and *Kerr v.

Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

As the following makes evident, the lodestar calculation can be burdensome.

Thankfully, there is a second, more readily administrable method for evaluating the

reasonableness of attorneys' fees.  When the settlement of a derivative action creates a

common fund—that is, a pool of money from which any fees and expenses can be

deducted—courts may "award attorneys a percentage of the common fund in lieu of the

23

often more time-consuming task of calculating the lodestar." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).  Indeed, this court has gone so far as to say that the "percentage-of-recovery method is favored in common-fund cases." *Willcox v. Lloyds TSB Bank, plc*, Civ. No. 13-00508, 2016 WL 7238799, at *13 (D. Haw. Dec. 14, 2016 (cleaned up)).

Plaintiffs contend that their requested attorneys' fees are reasonable under the percentage-of-recovery method.  The court agrees.

The requested attorneys' fees (of $25 million) constitute exactly 25 percent of the common fund.  Taken together with the requested expenses, and interest adjustments, the total award will be just modestly north of that figure.  And 25 percent "is the 'benchmark' that district courts should award in common fund cases." *Pac. Enters.*, 47 F.3d at 379 (citation omitted); *see also Lloyds TSB Bank*, 2016 WL 7238799, at *13.  A deviation from that benchmark is warranted when circumstances warrant—for example, if counsel "achieved exceptional results," the case "was risky" for counsel, and the case "was handled on a contingency basis." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015) (cleaned up).[4]

---

[4]     This is a diversity jurisdiction case, which arguably means that Hawaiʻi law governs the question of attorneys' fees. *See Aquilina v. Certain Underwriters at Lloyd's London*, Civ. No. 18-cv-00496, 2022 WL 21309735, at *9-12 (D. Haw. Sept. 19, 2022).  But in all respects relevant here, Hawaiʻi law follows federal law in common fund cases. *Id.* at *10 (describing Supreme Court of Hawaiʻi precedent granting trial courts discretion "whether to employ the percentage method or the lodestar method" in "common fund

These factors are present here.  The result—a $100 million payment to HEI—is substantial.  As noted, Plaintiffs represent that it marks "the largest derivative cash recovery on behalf of a company incorporated in a universal demand state and among the largest derivative cash recoveries in history."  Dkt. No. 104-1, at PageID.2101.  And while the unprecedented size of the award is less surprising because of the unprecedented scale of the harm that flowed from the alleged misconduct in this case, there is no doubt that the settlement fund is extraordinarily large in an absolute sense.  Nor is there any doubt that the fund is extraordinarily large when viewed against the risks of further litigation and the realistic possibility that full-blown litigation could have resulted in no award for HEI at all.  This factor supports Plaintiffs' requested fees and expenses.

It is also evident that the case was risky for Plaintiffs' counsel.  The risks of this litigation were explored earlier, and they are significant.  Yet in the face of those risks, Plaintiffs' counsel handled this matter on a fully contingent basis, "while paying out-of-pocket for all expenses incurred."  *Id.* at PageID.2103.  They pursued these actions in HEI's best interests "while assuming the significant risk that they would receive no compensation and no recovery of expenses after years of litigation."  *Id.*  Given the

---

cases," and recognizing "the existence of the 25% benchmark for the percentage method" (cleaned up)).  Accordingly, at the hearing on May 28, 2026, all counsel stipulated to the court applying Hawai'i law without the need to definitively resolve the choice-of-law question.

highly complex nature of this litigation, these circumstances strongly support Plaintiffs' requested fees and expenses.

Nor, under the particular circumstances of this case, does the fact that the case has been stayed since July 2024 undermine the reasonableness of the 25 percent benchmark.  To be sure, courts have recognized that the 25 percent benchmark should not be woodenly followed.  And courts have reduced attorneys' fee awards when "there has been relatively little litigation" owing to a stay.  *Chenoy*, 2025 WL 948065, at *7.  Moreover, "to avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases."  *Rodman v. Safeway, Inc.*, No. 11-cv-03003, 2018 WL 4030558 (N.D. Cal. Aug. 23, 2018) (cleaned up).  But neither of these considerations warrants a downward departure here.

As noted, the limited amount of formal litigation on the court's docket is not a reflection of the full volume of work Plaintiffs' counsel performed in this case.  Despite the stay, Plaintiffs' counsel represent that their factual and legal work on this case has been extensive.  That work included a substantial pre-filing investigation.  Dkt. No. 104-1, at PageID.2095-96.  And it involved extended and detailed efforts at mediation, which were assisted by a neutral mediator.  Plaintiffs' counsel could not have effectively negotiated with Defendants throughout these mediation efforts if they had not, as they represent, put a great deal of work into the development of their case.  The positive

26

result they obtained for HEI confirms not only that they put the work in, but also that a reduction of the fee award is not necessary to ensure a just result. *Cf. Chenoy*, 2025 WL 948065, at *5-7 (reducing fee award because the settlement of another case appears to have "paved the way" for the settlement at issue, and because the settlement at issue did not produce substantial benefits for the company).

As to the danger of a windfall given the sheer size of the monetary award from which a 25 percent cut is being drawn, that concern does not warrant reducing the percentage on the record presented here. Again, given the substantial work Plaintiffs' counsel performed—multiple experienced counsel, across two sets of consolidated federal derivative actions and consolidated state derivative actions, all of which are being settled here—coupled with the substantial monetary award that HEI is receiving and the fact that neither HEI's board nor HEI's shareholders expressed any opposition to this anticipated request for attorneys' fees, the court is satisfied that while the fee award here is large, it is reasonable.[5]

## 2.    The Requested Award of Expenses Is Reasonable

As noted, Plaintiffs' counsel also seek an award of reasonable litigation expenses in the amount of $168,624.99. In support of that request, they have submitted

---

[5]    It may prove challenging to divvy up this fee award among the various counsel who have expended substantial time and effort on this matter, but the parties' settlement agreement provides for the mandatory mediation of any such disputes. *See supra* pp.10–11.

declarations from various counsel who worked on the matters being settled here.  *See*

Dkt. Nos. 104-14 (Decl. of Erik W. Luedeke on behalf of Robbins Geller Rudman &

Dowd LLP); 104-15 (Decl. of Ashley R. Rifkin on behalf of Robbins LLP); 104-16 (Decl.

of Benjamin I. Sachs-Michaels on behalf of Glancy Prongay Wolke & Rotter LLP); 104-17

(Decl. of Carl M. Varady); 104-18 (Decl. of Seth D. Rigrodsky on behalf of Rigrodsky

Law, P.A.); 104-19 (Decl. of Gregory M. Egleston on behalf of Gainey McKenna &

Egleston); 104-20 (Decl. of Erica L. Stone on behalf of the Rosen Law Firm, P.A.); 104-21

(Decl. of Betsy C. Manifold on behalf of Wolf Haldenstein Adler Freeman & Herz LLP);

104-22 (Decl. of Francis A. Bottini, Jr., on behalf of Bottini & Bottini, Inc.); 104-23 (Decl.

of Addison D. Bonner on behalf of Bonner Sogi & Associates, ALC); and 104-24 (Decl. of

Willem F. Jonckheer on behalf of Schubert Jonckheer & Kolbe LLP).  From these

declarations and the information they provide about the expenses Plaintiffs' counsel

incurred (all on a contingency basis), the court is satisfied that the requested expense

award is reasonable.

### 3.      The Requested Service Awards Are Reasonable

Finally, the court agrees that "[i]n shareholder derivative actions, an incentive

award of $5,000 per plaintiff is reasonable."  *In re Apple Inc. S'holder Derivative Litig.*, No.

4:19-cv-05153, Dkt. No. 87, at pg. 6 (N.D. Cal. July 17, 2024).  Moreover, awards of this

nature are permissible under Hawai'i state law.  *See Aquilina*, 2022 WL 21309735, at *10.

The requested service award of $5,000 to each Plaintiff is, therefore, approved.

28

## CONCLUSION

For the foregoing reasons, the court finds that the settlement is fair, reasonable, and adequate, and that Plaintiffs' requested fees and expenses are reasonable.  All will be approved, and to that end, the court now enters the parties' proposed Final Approval Order:

## ORDER

This matter came before the Court for hearing pursuant to the Order of this Court, dated March 9, 2026 (the "Order"), on Plaintiffs' motion for final approval of the settlement (the "Settlement") set forth in the Stipulation of Settlement, dated December 31, 2025 (the "Stipulation").  Due and adequate notice having been given of the Settlement as required in said Order, and the Court having considered all papers filed and proceedings had herein, and otherwise being fully informed in the premises and good cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.      This Final Approval Order incorporates by reference the definitions in the Stipulation, and all capitalized terms used herein shall have the same meanings as set forth in the Stipulation (in addition to those capitalized terms defined therein).

2.      This Court has jurisdiction over the subject matter of the Actions, including all matters necessary to effectuate the Settlement, and over all parties to the Actions and the Settlement, including, but not limited to, Plaintiffs, Hawaiian Electric

Industries, Inc. ("HEI"), Hawaiian Electric Company, Inc. ("HECO," and together with

HEI, "Hawaiian Electric"), all Hawaiian Electric shareholders, and the Individual

Defendants.

3.    The Court finds that the notice provided to Hawaiian Electric

shareholders was the best notice practicable under the circumstances of these

proceedings and of the matters set forth therein, including the Settlement set forth in

the Stipulation, to all Persons entitled to such notice.  The notice fully satisfied the

requirements of Federal Rule of Civil Procedure 23.1 and due process.

4.    The Hawaii Federal Action and all claims contained therein, as well as all

of the Released Claims, are dismissed with prejudice.  As among Plaintiffs, the

Individual Defendants, and Hawaiian Electric, the parties are to bear their own costs,

except as otherwise provided in the Stipulation.

5.    The Court finds that the terms of the Stipulation and Settlement are fair,

reasonable, and adequate as to each of the Settling Parties and in the best interests of

Hawaiian Electric and its shareholders, and hereby finally approves the Stipulation and

Settlement in all respects, and orders the Settling Parties to perform its terms to the

extent the Settling Parties have not already done so.

6.    Upon the Effective Date, as defined in ¶¶ 1.8 and 6.1 of the Stipulation,

HEI, HECO, and each of their respective Related Parties and shareholders, and

Plaintiffs (acting on Plaintiffs' own behalf and derivatively on behalf of Hawaiian

Electric and its shareholders), for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have, and by operation of law and of this Final Approval Order and the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged and dismissed with prejudice each and every one of the Released Claims (including Unknown Claims) against any of the Released Defendants' Persons. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

7.      Upon the Effective Date, as defined in ¶¶ 1.8 and 6.1 of the Stipulation, HEI, HECO, and each of their respective Related Parties and shareholders, and Plaintiffs (acting on Plaintiffs' own behalf and derivatively on behalf of Hawaiian Electric and its shareholders), for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be forever barred and enjoined from commencing, instituting, or prosecuting any of the Released Claims (including Unknown Claims) against any of the Released Defendants' Persons and shall forever be foreclosed from challenging the fairness, reasonableness, or adequacy of the Settlement as incorporated in the Stipulation, or the determination that the Settlement as incorporated in the Stipulation is in the best interests of Hawaiian Electric and its shareholders.  Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

8.      Upon the Effective Date, as defined in ¶¶ 1.8 and 6.1 of the Stipulation, each of the Defendants, for good and sufficient consideration, the receipt and adequacy of which are hereby acknowledged, shall be deemed to have, and by operation of law and of this Final Approval Order and the Judgment shall have, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged each and all of Plaintiffs, Plaintiffs' Counsel, and all current Hawaiian Electric shareholders (solely in their capacity as Hawaiian Electric shareholders) from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Actions or the Released Claims.  Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

9.      The Court hereby approves the Fee and Expense Amount in the amount of $25,000,000 in attorneys' fees and $168,624.99 in reasonable litigation expenses, in accordance with the Stipulation, and finds that such fee is fair and reasonable in light of the $100,000,000 payment made for the benefit of Hawaiian Electric as a result of the Settlement.

10.     The Court hereby approves the service awards of $5,000 for each of the Plaintiffs in accordance with the Stipulation in recognition of Plaintiffs' participation and effort in the prosecution of the Actions.

11.    Neither the Stipulation nor the Settlement, including any Exhibits attached thereto, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement:  (i) is or may be deemed to be or may be offered, attempted to be offered or used in any way as a concession, admission, or evidence of the validity of any Released Claims, or of any fault, wrongdoing or liability of any Released Defendants' Person or Hawaiian Electric; (ii) is or may be deemed to be or may be used as a presumption, admission, or evidence of any liability, fault, or omission of any of the Released Defendants' Persons or Hawaiian Electric in any civil, criminal, administrative, or other proceeding in any court, administrative agency, tribunal or other forum; or (iii) is or may be deemed to be construed, offered, or received in evidence as an admission, concession, or presumption against Plaintiffs that any of their claims are without merit, or that any defenses asserted by the Individual Defendants have any merit.  Neither the Stipulation nor the Settlement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that Plaintiffs or any of the Released Defendants' Persons may file or use the Stipulation, the Final Approval Order, and/or the Judgment in any action or other proceeding that may be brought by or against them in order to support a defense, claim, or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, good faith settlement, standing, judgment bar, or reduction

33

or any other theory of claim preclusion or issue preclusion or similar defense, claim, or counterclaim.

12.     During the course of the Actions, the parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11, and all other similar laws relating to the institution, prosecution, defense of, or settlement of the Actions.

13.     Without affecting the finality of this Final Approval Order and the Judgment in any way, this Court hereby retains continuing and exclusive jurisdiction over the Hawaii Federal Action and the parties to the Stipulation to enter any further orders as may be necessary to effectuate, implement, and enforce the Stipulation and the Settlement provided for therein and the provisions of this Final Approval Order.

14.     This Final Approval Order and the Judgment is a final and appealable resolution in the Hawaii Federal Action as to all claims and the Court directs immediate entry of the Judgment forthwith by the Clerk in accordance with Federal Rule of Civil Procedure 58, dismissing the Hawaii Federal Action with prejudice.

//

//

//

//

//

34

IT IS SO ORDERED.

DATED:  May 28, 2026, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 24-00164 MWJS-WRP; *In re Hawaiian Electric Industries, Inc., Stockholder Derivative Litigation*; OPINION AND ORDER APPROVING DERIVATIVE SETTLEMENT AND ORDER OF DISMISSAL WITH PREJUDICE